**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANN CHAE, Individually and On
Behalf of All Others Similarly
Situated; WILLIAM COAKLEY,
Individually and On Behalf of All
Others Similarly Situated; HOON
KOO, Individually and On Behalf
of All Others Similarly Situated;
CARLOS A. PINEDA, Individually
and On Behalf of All Others
Similarly Situated,
            *Plaintiffs-Appellants,*

            v.

SLM CORPORATION, DBA Sallie
Mae; SALLIE MAE SERVICING
CORPORATION; SALLIE MAE, INC.,
            *Defendants-Appellees,*

            and

UNITED STATES OF AMERICA,
            *Plaintiff-intervenor-Appellee.*

No. 08-56154

D.C. No.
2:07-cv-02319-
R-RC

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
November 5, 2009—Pasadena, California

Filed January 25, 2010

1371

Before: Ronald M. Gould and Carlos T. Bea, Circuit Judges, and William T. Hart,* District Judge.

Opinion by Judge Gould

---

*The Honorable William T. Hart, Senior District Judge for the Northern District of Illinois, sitting by designation.

## COUNSEL

William J. Genego (argued), Nasatir, Hirsch, Podberesky & Genego, Santa Monica, California; Michael D. Braun, Braun

Law Group, P.C., Los Angeles, California; Andrew Friedman and Victoria Nugent, Cohen, Milstein, Sellers & Troll, Washington, D.C., for the plaintiffs-appellants.

S. Dawn Scaniffe, Mark B. Stern and Sydney Foster (argued), Department of Justice, Washington, D.C., for the plaintiff-intervenor-appellee.

Julia B. Strickland (argued), Lisa M. Simonetti, and David W. Moon, Stroock & Stroock & Lavan LLP, Los Angeles, California, for the defendants-appellees.

**OPINION**

GOULD, Circuit Judge:

Appellants urge error in the district court's grant of summary judgment rejecting student borrowers' claims that challenge loan servicer methods of calculating interest, assessing late fees and setting the repayment start date on their loans. We must determine the preemptive scope of the statutes and regulations governing lenders and third-party loan servicers under the Federal Family Education Loan Program of the Higher Education Act. We conclude that the student borrowers' claims are preempted by this federal law and we affirm the district court's grant of summary judgment on that ground.

**I**

The Higher Education Act (HEA) of 1965, now codified at 20 U.S.C. §§ 1001-1155, was passed "to keep the college door open to all students of ability, regardless of socioeconomic background." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009) (internal quotation marks omitted). As part of that effort, Congress established the Federal Family Education Loan Program (FFELP), a system of

loan guarantees meant to encourage lenders to loan money to students and their parents on favorable terms.[1] *See* 20 U.S.C. §§ 1071-1087-4; *Rowe*, 559 F.3d at 1030. The Secretary of the Department of Education (DOE) is authorized to "prescribe such regulations as may be necessary to carry out the purposes" of the FFELP. 20 U.S.C. § 1082(a)(1). Under that authority, the DOE has promulgated detailed regulations. *See* 34 C.F.R. §§ 682.100-682.800. We preliminarily review how the FFELP operates, and thereafter explain the procedural history of this case.

## A

The FFELP regulates a series of transactions related to student loans. The first layer of transactions occurs between lenders and student or parent borrowers. Eligible banks, credit unions, schools, government agencies, non-profits, and others may make loans to students. 34 C.F.R. § 682.101(a). The lenders must abide by the terms of the FFELP, and the DOE may terminate the participation of any lender who does not follow the rules. 34 C.F.R. §§ 682.700-.713. Lenders may assign their loans to third-party loan servicers, in which case the loan servicer must also abide by the FFELP regulations. *See* 20 U.S.C. § 1082(a)(1); 34 C.F.R. §§ 682.203, 682.700(a).

A second layer of FFELP transactions involves "guaranty agencies" that guarantee the lenders' loans. A guaranty agency is a "State or private nonprofit organization that has an agreement with the Secretary under which it will administer a loan guarantee program under the Act." 34 C.F.R.

---

[1]The FFELP governs loans made to students by private lenders. It was formerly named the "Guaranteed Student Loan Program" before being renamed in 1992. Higher Education Amendments of 1992, Pub. L. No. 102-325, § 411(a)(1), 106 Stat. 448, 510 (1992). The government operates a parallel program through which it lends money to students directly, called the William D. Ford Federal Direct Loan Program. *See* 20 U.S.C. §§ 1087a-1087j.

§ 682.200(b); *see also* 34 C.F.R. § 682.400 (requiring that a guarantee agency enter into four specific agreements with the DOE before it may participate in the FFELP). When a borrower defaults on his or her student loan and the lender is unable to recover the amount despite due diligence, the lender recoups its loss from the guarantor. 34 C.F.R. § 682.102(e)(7) ("If a borrower defaults on a loan, the guarantor reimburses the lender for the amount of its loss. The guarantor then collects the amount owed from the borrower.").

A third level of FFELP transactions takes place between the guaranty agencies and the DOE. Guaranty agencies must enter agreements with the DOE in order to participate in the FFELP. 20 U.S.C. § 1078(c). After an agreement is entered, the DOE acts as a secondary insurer on the loans guaranteed by the agency. 20 U.S.C. §§ 1071(a)(1)(D), 1078(c). When a lender assigns its guaranty agency a defaulted loan, the guaranty agency must take diligent steps to recover the default amount, but, having done so, may then recover up to one hundred percent of its losses from the DOE if it is unable to collect the debt. 34 C.F.R. §§ 682.404(a), 682.410(b)(6).

The FFELP governs four types of loans. Three of these are at issue in this appeal.[2] First, Stafford Loans are made to students, 20 U.S.C. §§ 1071(c), 1078, 1078-8, and may be either subsidized or unsubsidized. For subsidized Stafford Loans, the government pays interest on the loan during specified periods, such as when the student borrower is attending school on at least a part-time basis. 20 U.S.C. § 1078(a)-(b). For unsubsidized Stafford Loans, the student is responsible for all accrued interest from the time the loan is disbursed and the government pays none of it. 20 U.S.C. § 1078-8(e)(3). The second type of loan here involved is a Consolidation Loan, which allows the borrower to consolidate multiple loan

---

[2]Also regulated by the FFELP, but not at issue on this appeal, are PLUS Loans made to the parents of college students. *See* 20 U.S.C. § 1078-2. All plaintiffs here were student borrowers; none had PLUS Loans.

obligations with one lender. *See* 20 U.S.C. § 1078-3(a). The third type of loan falls under the Supplemental Loans to Students Program, which applied to periods of student enrollment beginning before July 1, 1994, and has since been discontinued. 34 C.F.R. § 682.100(a)(2).

Congress directs the DOE to issue common application forms and promissory notes to be used by FFELP participants. 20 U.S.C. §§ 1082(m)(1)-(4). These common forms include a free application form, master promissory note, and common loan deferment form. *Id.* The purpose of the common forms is to standardize the terms and formatting to help applicants understand their loan obligations. *Id.* § 1082(m)(1)(B).

## B

The plaintiffs in this diversity action—Ann Chae, William Coakley, Hoon Koo, and Carlos A. Pineda—took out Stafford, Supplemental, and Consolidated Loans from various lenders between 1993 and 2006. Sallie Mae, Inc. (Sallie Mae) was the loan servicer for each of the plaintiffs' loans.[3] In its capacity as a third-party servicer, Sallie Mae performed administrative and servicing functions related to the loans, such as issuing billing statements, collecting and processing payments, assessing and collecting late fees, and giving notices to borrowers required by FFELP regulations.

The plaintiffs sued Sallie Mae, on behalf of a purported class of similarly-situated borrowers, complaining about three practices Sallie Mae uses in servicing student loans. First, the plaintiffs challenge Sallie Mae's use of the "daily simple interest" or "simple daily interest" method of calculating interest. This calculation method applies a borrower's pay-

---

[3]Sallie Mae argues that the other defendants—SLM Corporation and Sallie Mae Servicing Corporation—are not proper parties. In light of our holding that all the defendants were entitled to summary judgment, we need not and do not reach this argument.

ment on the date the payment is received, not the date the payment is due, such that interest accrues based on the number of days since the last payment. This means that borrowers who make payments before the due date pay less overall interest, while borrowers who make payments after the due date pay more overall interest. The plaintiffs claim that the terms of the loan agreements prevent Sallie Mae from using the daily simple method of calculating interest. Instead, the plaintiffs allege that their loan contracts require Sallie Mae to use the "installment method." Under the installment method, the total amount of interest is fixed and does not vary depending on the date when payment is remitted. The plaintiffs in their complaint asserted that Sallie Mae's failure to use the installment method conflicts with the FFELP statutes and regulations, offends the terms of the loan documents and otherwise violates California law.

Second, the plaintiffs challenge Sallie Mae's practice of assessing late fees. When permitted by the borrower's promissory note, Sallie Mae charges a late fee of up to six percent of each installment remitted more than fifteen days after it is due. The plaintiffs allege that California law prohibits Sallie Mae from charging late fees, at least where Sallie Mae also charges daily simple interest.

Third, the plaintiffs challenge Sallie Mae's method of setting the first repayment date on a Consolidation or PLUS loan. Sallie Mae charges interest on these loans from the day they are disbursed and sets the borrower's first repayment date within sixty days after disbursement. Because Sallie Mae charges interest during that period of up to sixty days, the plaintiffs argue that Sallie Mae deceptively increases the cost and life span of the loan.

All told, the plaintiffs allege and have argued that Sallie Mae's loan-servicing practices violate California business, contract, and consumer-protection law.[4] They request actual

---

[4]The plaintiffs pleaded five causes of action: (1) engagement in unlawful, unfair or fraudulent business practices as defined by the Unfair Com-

and punitive damages, restitution, and injunctive relief to prevent Sallie Mae from employing the challenged practices in the future. The United States filed a motion to intervene as a plaintiff seeking a declaratory judgment that the plaintiffs' state law claims were preempted by federal law. The district court granted the United States' motion. The parties then moved for summary judgment in whole or in part, and the plaintiffs also moved to certify the class.

The district court granted summary judgment in favor of Sallie Mae. It held that all the plaintiffs' claims were preempted by the HEA, and alternatively held that each claim failed on the merits. The district court dismissed the remaining motions as moot and entered judgment in favor of Sallie Mae. The plaintiffs timely appealed.

We have jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment de novo. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1035 (9th Cir. 2007).

## II

[1] The Supremacy Clause of the Constitution provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.[5] "Consistent with that command," the United States Supreme Court has recognized that "state laws

---

petition Law at California Business & Professional Code § 17200; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) violation of the Consumer Legal Remedies Act under California Civil Code § 1770(a); and (5) unjust enrichment.

[5]Article VI, clause 2, states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

that conflict with federal law are 'without effect.' " *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). We have succinctly delineated the Supreme Court's principles, holding: "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000), *abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 431-34 (2002); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (discussing express, conflict, and field preemption); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (same).

**[2]** Turning now to the issues before us, we have previously held that field preemption does not apply to the HEA. *See Keams v. Tempe Technical Inst., Inc.*, 39 F.3d 222, 225-226 (9th Cir. 1994) ("It is apparent . . . that Congress expected state law to operate in much of the field in which it was legislating."); *accord Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir. 1999) (affirming prior holding that "federal education policy regarding [private lending to students] is not so extensive as to occupy the field"). Accordingly, under our precedent field preemption is off the table to resolve this case involving the HEA and its attendant federal regulations. The legal standards governing express preemption and conflict preemption are the standards that control our decision.

### III

**[3]** We focus first on the law of express preemption. The Supreme Court has made clear that Congress may indicate its intent to displace state law through express language. *Altria Group*, 129 S. Ct. at 543. Where Congress enacts an express

preemption provision, our task is to interpret the provision and "identify the domain expressly pre-empted by that language." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996) (internal quotation marks omitted). We use the text of the provision, the surrounding statutory framework, and Congress's stated purposes in enacting the statute to determine the proper scope of an express preemption provision. *Id.* at 485-86; *Cipollone*, 505 U.S. at 516.

**[4]** Congress has enacted several express preemption provisions applicable to FFELP participants. *See, e.g.*, 20 U.S.C. §§ 1078(d), 1091a(a)(2)(B), 1091a(b)(1)-(3), 1095a(a), 1098g. These provisions expressly preempt the operation of state usury laws, statutes of limitations, limitations on recovering the costs of debt collection, infancy defenses to contract liability, wage garnishment limitations, and disclosure requirements. This last provision, 20 U.S.C. § 1098g, is entitled, "Exemption from State disclosure requirements." The text of the statute reads: "Loans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act . . . shall not be subject to any disclosure requirements of any State law." *Id.* The FFELP falls within Title IV of the HEA, and is thus subject to its express preemption provision.

**[5]** We conclude that 20 U.S.C. § 1098g applies to, and thus precludes, several of the plaintiffs' state law claims. Two of the plaintiffs' Unfair Competition Law claims allege that Sallie Mae employs "unfair" and "fraudulent" business practices by using billing statements and coupon books that trick borrowers into thinking that interest is being calculated via the installment method when Sallie Mae really uses a simple daily calculation. *See* Cal. Bus. & Prof. Code § 17200. A similar allegation concerns Sallie Mae's practice of using statements that set the first repayment date. Under California's Consumer Legal Remedies Act, the plaintiffs allege that the billing statements and standardized loan applications "misrepresent[ ] that the Student Loans confer rights, remedies, and

obligations" which do not exist, thereby constituting an unfair or deceptive practice. *See* Cal. Civ. Code § 1770(a).

At bottom, the plaintiffs' misrepresentation claims are improper-disclosure claims. The plaintiffs do not contend that California law prevents Sallie Mae from employing any of the three loan-servicing practices at issue. We consider these allegations in substance to be a challenge to the allegedly-misleading method Sallie Mae used to communicate with the plaintiffs about its practices. In this context, the state-law prohibition on misrepresenting a business practice "is merely the converse" of a state-law requirement that alternate disclosures be made. *See Cipollone*, 505 U.S. at 527.

**[6]** The plaintiffs dispute this characterization of their claims, arguing that they do not seek specific disclosures, but merely seek to stop Sallie Mae from fraudulently and deceptively misleading borrowers through the written documents. But preemption cannot be avoided simply by relabeling an otherwise-preempted claim. *Id.* (recognizing that a fraudulent-misrepresentation claim was a restated failure-to-warn claim subject to express preemption). Under the very terms of the FFELP, a "misleading" disclosure would be improper. *See* 20 U.S.C. § 1082(m)(1)(B) (requiring common forms to use "clear, concise, and simple language to facilitate understanding of loan terms and conditions by applicants"); 34 C.F.R. § 682.205(a)(1), (b), (c)(1) (requiring lenders to make a series of disclosures in "simple and understandable terms"). A properly-disclosed FFELP practice cannot simultaneously be misleading under state law, for state disclosure law is preempted by the federal statutory and regulatory scheme. We conclude that the plaintiffs' claims challenging the language in Sallie Mae's billing statements and coupon books are restyled improper-disclosure claims, and are therefore subject to express preemption under 20 U.S.C. § 1098g.[6]

---

[6]The plaintiffs argue that our holding will leave them without a means to remedy Sallie Mae's alleged misrepresentations. We disagree. The

The plaintiffs' remaining claims allege breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and the use of fraudulent and deceptive practices apart from the billing statements. These claims are not impacted by any of the FFELP's express preemption provisions. We next examine whether principles of conflict preemption apply to bar any of those claims.

## IV

**[7]** Addressing conflict preemption, we again may start with a principle that has been declared by the United States Supreme Court: A state law, whether arising from statute or common law, is preempted if it creates an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). We discern congressional objectives by "examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* Congress codified several explicit FFELP purposes at 20 U.S.C. § 1071(a)(1). The first is "to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions." *Id.* § 1071(a)(1)(A). Adequate loan insurance programs make lending to college students a less-risky proposition. Two additional FFELP purposes—"to provide a Federal program of student loan insurance," and "to guarantee a portion of each loan insured"—have the same effect. *See id.* §§ 1071(a)(1)(B), (D). By covering student loans with layers of insurance and guarantees, Congress encourages private lenders to help fund higher education. The government argues

---

DOE has the power to institute informal compliance procedures against a third-party servicer who is the subject of a complaint. 34 C.F.R. § 682.703. When stronger medicine is required, the DOE may file suit against the servicer, impose civil penalties, and terminate the servicer's participation in the program. 20 U.S.C. §§ 1082(a)(2), (g)(1), (h)(1). If Sallie Mae's disclosures are misleading, the plaintiffs' remedy is to complain about Sallie Mae to the DOE and to ask the agency to intervene.

that to accomplish the goal of encouraging such lending, Congress intended that the core aspects of the FFELP be uniform. We examine the FFELP to evaluate whether it shows a preference for uniformity, and, if we find such intent demonstrated, we will determine whether the plaintiffs' claims conflict with a policy of uniformity.

We must be cautious about conflict preemption where a federal statute is urged to conflict with state law regulations within the traditional scope of the state's police powers. When we deal with an area in which states have traditionally acted, the Supreme Court has told us to start with the assumption that a state's historic police powers will not be superseded absent a "clear and manifest purpose of Congress." *Wyeth v. Levine*, 129 S. Ct. 1187, 1195 (2009). Contract and consumer protection laws have traditionally been in state law enforcement hands. *See, e.g.*, *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 174 (1982); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963); *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir. 2004). The Supreme Court has said that a "presumption against preemption" may apply to preserve state law claims in the face of preemption claims. *See Medtronic*, 518 U.S. at 485 (citing *Cipollone*, 505 U.S. at 518). Accordingly, we would not lightly decide that the plaintiffs' contract and consumer protection claims under California law are preempted by conflict preemption with the HEA. Yet, it is our duty to consider carefully what Congress was trying to accomplish in the HEA and whether these state law claims create an "obstacle" to the congressional purposes. *See Crosby*, 530 U.S. at 373.

**A**

**[8]** In determining Congress's intent in enacting the FFELP, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law." *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481

U.S. 41, 51 (1987) (alteration omitted)). After reviewing the FFELP as a whole, we agree with the DOE that Congress intended it to operate uniformly. That intent is shown by the comprehensive framework that Congress set up to govern the $2 billion per year program. *See* 20 U.S.C. § 1074. The statutes describe the nuts and bolts of the FFELP, defining the required terms of each type of loan. *See id.* §§ 1078, 1078-2, 1078-3. The statutes go so far as to mandate specified repayment terms and specified insurance and guaranty requirements. *Id.* As one example, the FFELP sets the maximum interest rate that a lender may charge, depending on the type of loan and the date when it was taken out. *Id.* §§ 1077a. Such precisely-detailed provisions show congressional intent that FFELP participants be held to clear, uniform standards.

Congress's direction to the DOE shows that it aimed for uniformity of FFELP regulations. The DOE has the power to prescribe regulations necessary "to establish minimum standards" for lenders and servicers. *Id.* § 1082(a)(1). In a subsection entitled, "Uniform administrative and claims procedures," Congress tells the DOE to develop standardized forms and to require their use within the program. *Id.* § 1082(l)(1). Here is Congress: "The forms and procedures [that the DOE must prescribe] shall include *all aspects of the loan process* as such process involves eligible lenders and guaranty agencies." *Id.* § 1082(*l*)(2)(A) (emphasis added). This is a clear command for uniformity. Yet another section, this one entitled "Common forms and formats," tells the DOE to "prescribe common application forms and promissory notes," including forms used by FFELP participants for funding applications, payment deferrals, and loan reporting. *Id.* § 1082(m)(1)-(3). In the rules governing the Direct Loan Program, Congress created a policy of inter-program uniformity by requiring that "loans made to borrowers [under the Direct Loan Program] shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFELP]." *Id.* § 1087e(a)(1). Congress's instructions to the DOE on how to implement the

student-loan statutes carry this unmistakable command: Establish a set of rules that will apply across the board.

Regulatory uniformity can be a helpful tool if Congress's objectives in passing the FFELP are to be realized fully. The House Committee on Education and Labor discussed the need for binding regulations during the major amendments to the FFELP in 1992. H.R. Rep. No. 102-447, at 41-42 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334, 374-75. The Committee emphasized the federal nature of the program, and sought more thorough regulations that would, among other things, "ensure the stability in the loan program." *Id.* at 41. Stability is necessarily affected by the continued participation of private lenders. One need not have an advanced degree in risk management and financial practices to believe, as we have previously suggested, that "exposure to lawsuits under fifty separate sets of laws and court systems could make lenders reluctant to make new federally-guaranteed student loans." *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1264 (9th Cir. 1996). Thus we have held that the FFELP "requires uniformly administered . . . standards in order to remain viable." *Id.* at 1266. In this sense, were the law to indulge the plaintiffs' California state law claims, and thereby to endorse the possibility of similar claims being asserted under varying state laws in each of the fifty states, it would impair and threaten the efficacy of the federal lending effort for students.

The plaintiffs' primary reply to the DOE's uniformity argument is based on the Fourth Circuit's decision in *College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005). In that suit between two lenders, the plaintiff sought to use evidence that the defendant violated the FFELP regulations to satisfy elements of various state law causes of action. *Id.* at 589, 597. The district court found the claims preempted insofar as they permitted a private entity to interpret and enforce the HEA, because only the DOE was permitted to remedy FFELP violations under the HEA, and permitting the state suit

would therefore erect an obstacle to uniform FFELP enforcement. *Id.* at 593, 96-97. The Fourth Circuit reversed, explaining that it was "unable to confirm that the creation of 'uniformity' . . . was actually an important goal of the HEA." *Id.* at 597.

*College Loan* is not the law of our circuit, and we do not consider the plaintiffs' argument based on it to be persuasive for the reasons we set forth above. Permitting varying state law challenges across the country, with state law standards that may differ and impede uniformity, will almost certainly be harmful to the FFELP. The costs of the program would go up and either there would be fewer loans made or loans made for lesser amounts or for higher interest, making it harder for students to gain the loan funds they need to get the education they want.

Moreover, even if within the Fourth Circuit, we would not apply *College Loan* because it is distinguishable from our case. First, *College Loan* involved a contractual relationship between lenders, which is not a relationship that the FFELP is primarily designed to govern. The Fourth Circuit stressed, "[i]mportantly, neither the district court nor the parties have explained how [the FFELP's] purposes would be compromised by a lender . . . pursuing breach of contract or tort claims against other lenders or servicers." *Id.* The situation differs where student borrowers invoke state law principles against lenders. To permit that would subject a national-level lender to the potentially varying laws of fifty states, dissuading lenders from FFELP participation and contravening the congressional purpose of facilitating student loans. Second, the plaintiff in *College Loan* sought to enforce FFELP rules, not to vary them. *See id.* at 591-94. The plaintiff's liability theory turned on the inter-lender contract that required HEA compliance. *Id.* Using an FFELP violation there as an element of the prima facie breach claim did not undermine the regulations, and posed no threat to accomplishment of congressional purposes. *See id.* at 597-98. The situation faced by the Fourth

Circuit is fundamentally different from that presented here, where the plaintiffs ask us to hold that Sallie Mae cannot rely on the FFELP statutes and regulations—at least not in California. The plaintiffs do not seek to buttress the FFELP framework, but rather to alter it in their home state. The *College Loan* analysis is inapplicable.

The plaintiffs also argue that uniformity cannot be a goal of the FFELP because the regulations set only "minimum standards" and permit flexibility within those standards. *See, e.g.*, 20 U.S.C. § 1082(a)(1) (authorizing the DOE to "establish minimum standards with respect to sound management and accountability of programs under [the FFELP]"). In particular, the plaintiffs point to regulatory flexibility with regard to the form of the billing statements and the decision about whether or not to charge late fees. *See* 34 C.F.R. §§ 682.202(f) (stating that a lender "may" charge a late fee), 682.205 (prescribing required disclosures but not a specific billing or disclosure form).

But the presence of some flexibility in the regulations does not mean that regulatory uniformity is not vital to the FFELP's success. Federal regulators often include calculated flexibility within their programs without violating congressional intent to have a federal program uniformly control. In *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), for example, a Department of Transportation regulation "deliberately provided [car manufacturers] with a range of choices among different passive restraint devices" after determining that doing so would maximize the congressional objective of road safety. *Id.* at 875. The flexibility in the regulation did not mean, as the plaintiffs would have us conclude here, that state law could further restrict the car manufacturers' choices. Rather, the flexible federal standard alone governed. *Id.* at 881.

*Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982), involved a similarly flexible regulation.

There, the Federal Home Loan Bank Board issued a regulation permitting savings and loan associations to include a due on sale clause in a mortgage contract "at its option." *Id.* at 147. The flexible policy was critical to the financial stability of the lending institutions, which in turn furthered the congressional purpose of encouraging associations to provide affordable credit for home purchases. *Id.* at 168; *see also* 12 U.S.C. § 1464(a) ("The lending and investment powers conferred by this section are intended to encourage [Federal savings associations] to provide credit for housing safely and soundly."). Because the permissive policy was "essential to the economic soundness of the thrift industry," only the federal regulation, and not a stricter California-law rule, was permitted to operate. *de la Cuesta*, 458 U.S. at 170.

*Geier* and *de la Cuesta* suggest that a uniform federal regulatory scheme can nevertheless contain a measure of flexibility within it. In this case, the DOE policy of permitting, but not requiring, lenders to charge late fees does not automatically mean that state law may operate freely. The same can be said for the disclosure requirements, which set out the mandatory elements but do not dictate the precise billing form Sallie Mae must use. The measured flexibility embodied in the DOE regulations does not contradict the overall purpose of nationwide regulatory uniformity that will be enhanced by a holding that the federal statute and federal regulations exclusively govern the uniform application of standards for the FFELP.

**[9]** In sum, we agree with the DOE that Congress intended uniformity within the program. The statutory design, its detailed provisions for the FFELP's operation, and its focus on the relationship between borrowers and lenders persuade us that Congress intended to subject FFELP participants to uniform federal law and regulations. *See Gade*, 505 U.S. at 99.

**B**

Having determined that Congress intended the FFELP to operate uniformly, we revisit and elaborate on whether the

California state law claims would stand as an obstacle to the FFELP's uniform operation. The DOE contends that application of California law here to the FFELP is an obstacle. We describe the agency's regulations on interest calculation, late fees, and the repayment start date, and then determine whether to defer to the DOE's view that permitting challenge under California law creates an obstacle to the regulations' uniform implementation.

The DOE's position on late fees and the repayment start date is straightforward. The FFELP regulations permit lenders to charge a late fee of up to six percent, if permitted by the borrower's promissory note, when a borrower "fails to pay all or a portion of a required installment payment within 15 days after it is due." 34 C.F.R. § 682.202(f)(2). The DOE contends that the plaintiffs' position—that California law prohibits the imposition of a late fee when daily simple interest is used—would create an obstacle to the uniform regulatory system that permits late fees. The conflict does not vanish, according to the DOE, merely because the regulation permits, but does not require, late fees. *See de la Cuesta*, 458 U.S. at 155 (accepting a nearly identical argument made by the Federal Home Loan Bank Board).

The DOE makes a similar argument about the repayment start date. The plaintiffs challenge Sallie Mae's practice of setting the repayment start date "as close as possible" to sixty days after disbursement, claiming that this practice allows Sallie Mae unfairly to collect additional interest. The DOE responds that Sallie Mae is authorized by statute and regulation to set the first repayment date up to sixty days out. *See* 20 U.S.C. §§ 1078-2(d)(1), 1078-3(c)(4); 34 C.F.R. §§ 682.209(a). To the extent that California law may lessen the sixty-day window, the DOE urges that state law would create an obstacle to the uniform administration of the FFELP.

[10] To our thinking, the DOE position on late fees and the repayment start date makes sense. If federal law permits late

fees and gives up to sixty days for repayment, to say that state law prohibits late fees and requires a prompter repayment period is in conflict. We therefore agree with the DOE that the plaintiffs' claims create a conflict with federal law on these two issues.

The DOE position on the interest charges is persuasive to us. The parties dispute whether, and how, the FFELP could work if participants were permitted to use varying methods of calculating interest. The plaintiffs claim that nothing bars Sallie Mae from using the installment method to service their loans, under which the interest amount is fixed at the beginning of the repayment period. The DOE counters that Sallie Mae is required by the regulatory framework to use the daily simple interest method. Although there is no regulation that explicitly requires lenders and third-party servicers to use the daily simple method, the DOE points to several sources that make the daily method a practical requirement. In particular, lenders must calculate the interest that the DOE pays on a subsidized Stafford Loan based on a balance calculation for "each day" in a given quarterly period. 34 C.F.R. § 682.304(b)-(c). That requirement would not be satisfied merely through use of the installment method. The record demonstrates that the DOE uses the daily method of calculation when it loans money to students directly, and also that the statutorily-prescribed common forms for Consolidation Loans require the consolidation lender to use the daily simple method. When viewed as a whole, the DOE argues that the FFELP scheme works only if all participants use the same method of calculating interest.

[11] We are persuaded by the DOE's view that the plaintiffs' interest-rate claims, if successful, would create an actual conflict with federal law. First, as noted earlier, Congress has granted the DOE broad authority to implement the FFELP. *See* 20 U.S.C. § 1082(a)-(p). Congress granted the DOE the power to prescribe regulations, access lender records, audit participants, impose civil penalties, suspend or terminate

lenders from the program, and sue regulatory violators. *Id.* A grant of "ample authority" to regulate a detailed legislative scheme, such as the one administered by the DOE here, is evidence that Congress intended the agency to have the authority to preempt state law. *See de la Cuesta*, 458 U.S. at 159.

**[12]** Second, in explaining how the interest calculation and transfer components of the FFELP work, the DOE is engaged in interpreting its own regulations. An agency's interpretation of its own regulations is "controlling" unless "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Supreme Court has described this standard as "deferential," *id.*, and this deference is particularly appropriate where the subject matter is technical and the relevant background complex. *See Geier*, 529 U.S. at 883. Under such circumstances, "[t]he agency is likely to have a thorough understanding of its own regulation and its objectives and is uniquely qualified to comprehend the likely impact of state requirements." *Id.* (internal quotation marks omitted). Here, the government intervened at the trial level to explain the "extensive and comprehensive regulations" governing the multilayered transactions taking place between borrowers, lenders, private guaranty agencies, and the DOE. These include the frequent payments of interest by borrowers and the DOE. The DOE made clear that the imposition of fifty sets of state law governing the calculation of interest would threaten its ability to carry out the congressional objectives of ensuring uniformity and stability within the program.

**[13]** Finally, the DOE contends that allowing states to impose varying interest-calculation requirements would compromise related loan programs, operated by the government, that depend on cross-program uniformity. These interpretations of the likely effect of state law on the FFELP are reasonable and within the DOE's statutory grant of authority. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173-74 (2007). We therefore defer to them.

Our analysis is not altered by the fact that the DOE has not promulgated a regulation explicitly stating the preemptive effect of its regulations. "Where, as here, an agency's course of action indicates that the interpretation of its own regulation reflects its considered views . . . we have accepted that interpretation as the agency's own, even if the agency set those views forth in a legal brief." *Id.* at 171 (citing *Auer*, 519 U.S. at 462). Deference can be appropriate even when an agency position was developed in response to the litigation under review, provided that the position does not prove to be a "post hoc rationalization" that "does not reflect the agency's fair and considered judgment on the matter in question." *Id.* (alteration and emphasis omitted). Here, there is no evidence that the DOE's position represents anything other than its considered view of the need for a uniform regulatory framework. First, intervenor DOE was not named as a defendant in this lawsuit, so it cannot be accused of creating a post hoc rationalization to avoid liability for itself. Second, the standardized forms—signed by the plaintiffs—were promulgated by the DOE long before this litigation arose. Those forms contain the "simple interest" and "daily simple interest" language that the DOE now cites in support of its position. Moreover, the DOE itself uses the method of calculating interest that it claims Sallie Mae is bound by, and cites the detailed information about interest calculations that it posts to its website and publishes in a pamphlet available to borrowers. The DOE has consistently implemented its uniform policy, and there is nothing to signal that deference to its position is unwarranted. "The failure of the Federal Register to address pre-emption explicitly is thus not determinative." *Geier*, 529 U.S. at 884.

The plaintiffs argue that the DOE's interpretation merits no deference, citing to the Supreme Court's recent opinion in *Wyeth v. Levine*, 129 S. Ct. 1187 (2009). We do not agree that *Wyeth* commands that we accord no weight to the DOE's view. In *Wyeth*, the Supreme Court evaluated the preamble to a Food and Drug Administration (FDA) regulation which purported to preempt any contrary state law. *Id.* at 1200. The

Court declined to defer to the conclusory statement of preemption embodied in the preamble, instead "perform[ing] its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of preemption." *Id.* at 1201. The Court's independent review revealed that all evidence of congressional intent pointed away from preemption, and that the FDA had recently, abruptly, and sweepingly changed its view about the preemptive role of its regulations. *Id.* at 1201-03.

No such circumstances are present here. Unlike the FDA's position in *Wyeth*, here the DOE's position about the FFELP's purpose of uniformity is in harmony with the evidence of congressional intent. The plaintiffs have cited us to no evidence of a "dramatic change in position" of the kind that concerned the Supreme Court in *Wyeth*. *See id.* at 1203. Because our independent review of the state and federal laws implicated by this dispute leads us to agree with the DOE that the plaintiffs' suit poses an obstacle to the uniform implementation of the FFELP sought by Congress, we accord the agency interpretational deference. *See id.* at 1201 (citing *Geier*, 529 U.S. at 883).

## V

**[14]** In conclusion, the plaintiffs' allegations that Sallie Mae makes fraudulent misrepresentations in its billing statements and coupon books are expressly preempted by the HEA, and conflict preemption prohibits the plaintiffs from bringing their remaining claims because, if successful, they would create an obstacle to the achievement of congressional purposes. Having carefully considered the FFELP and the purposes of Congress in the HEA, we conclude, beyond any doubt, that subjecting the federal regulatory standards to the potentially conflicting standards of fifty states on contract and consumer protection principles would stand as a severe obstacle to the effective promotion of the funding of student loans. Such an obstacle, which we consider hostile to the purposes

of Congress in this program, must bow to the overriding principles of conflict preemption and federal law supremacy.

**AFFIRMED.**