**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HOME BUILDERS ASSOCIATION OF
NORTHERN CALIFORNIA; BUILDING
INDUSTRY LEGAL DEFENSE
FOUNDATION; CALIFORNIA BUILDING
INDUSTRY ASSOCIATION; CALIFORNIA
STATE GRANGE; GREENHORN
GRANGE,
              *Plaintiffs-Appellants,*

                  v.

UNITED STATES FISH AND WILDLIFE
SERVICE; UNITED STATES
DEPARTMENT OF THE INTERIOR; GALE
A. NORTON, in her official capacity
as Secretary of Interior; H. DALE
HALL, in his official capacity as
Director of U.S. Fish and Wildlife
Service; MATTHEW J. HOGAN, in
his official capacity as Acting
Director of U.S. Fish and Wildlife
Service,
              *Defendants-Appellees,*

BUTTE ENVIRONMENTAL COUNSEL;
CALIFORNIA NATIVE PLANT SOCIETY;
DEFENDERS OF WILDLIFE,
  *Defendants-Intervenors-Appellees.*

No. 07-16732

D.C. No.
CV-05-00629-WBS

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted
June 15, 2010—San Francisco, California

11229

Filed August 9, 2010

Before: Pamela Ann Rymer and Raymond C. Fisher, Circuit Judges, and Rebecca R. Pallmeyer, District Judge.*

Opinion by Judge Pallmeyer

*The Honorable Rebecca R. Pallmeyer, United States District Judge for the Northern District of Illinois, sitting by designation.

## COUNSEL

M. Reed Hopper, Meriem L. Hubbard and Damien M. Schiff (argued), Pacific Legal Foundation, Sacramento, California, for the plaintiffs-appellants.

Ronald J. Tenpas, Andrew Mergen, Kevin W. McArdle and Robert H. Oakley (argued), U.S. Department of Justice, Washington, D.C., for the defendants-appellees.

Brian P. Segee, Defenders of Wildlife, Washington, D.C., and Neil Levine, Denver, Colorado, for the defendant-intervenors-appellees.

## OPINION

PALLMEYER, District Judge:

Home Builders Association of Northern California[1] and other industry groups (collectively "Home Builders") challenge the designation by the U.S. Fish and Wildlife Service ("FWS") of about 850,000 acres of land as critical habitat for fifteen endangered or threatened vernal pool species. In the district court, Butte Environmental Council and other conservation groups (collectively "Butte Environmental") intervened as defendants in support of the designation, and they have participated in the appeal. The district court upheld the designation, and Home Builders appeals, raising five technical challenges to FWS's procedure. We conclude that none of those challenges have merit, and we affirm.

## BACKGROUND

Vernal pools are a "unique kind of wetland ecosystem" that exists only temporarily. 68 Fed. Reg. 46,684, 46,685 (Aug. 6, 2003). The pools typically appear in spring—that is, vernally—following fall and winter rains before drying up until the following year. *Id.* Since the pools' existence depends on rainfall, pool size and location can vary from year to year. *Id.* at 46,685-86. To survive years in which no pool develops due to low rainfall, vernal pool species have developed a dormant stage: vernal pool plant seeds can remain viable for several years and the fertilized egg of a vernal pool crustacean can remain viable for ten years or more. *Id.* at 46,687, 46,689. The egg develops a thick shell that protects it from extreme temperatures and even digestive enzymes, meaning that it can be transported within the digestive tracts of animals without harm. *Id.* at 46,687.

---

[1] While this appeal was pending, Home Builders Association of Northern California changed its name to Building Industry Association of the Bay Area. We follow the parties' lead and continue to refer to appellants as Home Builders.

Three factors are necessary to the formation of vernal pools: a climate with a wet season to fill the pools and a dry season to evaporate them; soil that is impermeable or nearly impermeable to water so that rain water is not readily absorbed into the surface beneath the pools; and a topography that typically includes shallow depressions in which the pools form. *Id.* at 46,685. These factors tend to appear over continuous areas in which clusters of vernal pools—called complexes —are formed. *Id.* Vernal pool complexes include land that is not part of the pools themselves but that is necessary to provide water and nutrients to the pools: drainage pathways called "swales" and upland areas. *Id.* Alteration of those lands can negatively affect the health of the vernal pools themselves. *Id.*

Vernal pools are home to a diverse group of species, including freshwater crustaceans, amphibians, insects, and plants. *Id.* at 46,686. Those native species and the pools themselves provide food and habitat for various birds, toads, frogs, and salamanders. *Id.* Vernal pools are threatened by development of all kinds; researchers have estimated destruction of vernal pool habitat ranging from 60% in Oregon's Agate Desert area to 90% along the central California coast to nearly 100% in southern California. FWS, *Draft Recovery Plan for Vernal Pool Ecosystems of California and Southern Oregon* at I-15 (Oct. 2004), *available at* http://www.fws.gov/pacific/ecoservices/endangered/recovery/vernal_pool/ (last visited July 7, 2010). Species that make their homes in vernal pools are at risk as a result of the destruction: between 1978 and 1997, FWS designated as endangered or threatened four crustacean and eleven plant species native to vernal pools. 62 Fed. Reg. 33,029 (June 18, 1997); 62 Fed. Reg. 14,338 (Mar. 26, 1997); 59 Fed. Reg. 48,136 (Sept. 19, 1994); 57 Fed. Reg. 24,192 (June 8, 1992); 43 Fed. Reg. 44,810 (Sept. 28, 1978).

Under the Endangered Species Act ("ESA"), FWS is required, "to the maximum extent prudent and determinable," to designate critical habitat at the same time that it lists a spe-

cies as endangered or threatened. ESA § 4(a)(3)(A), 16 U.S.C. § 1533(a)(3)(A). Once habitat is designated as critical, federal agencies are prohibited from authorizing, funding, or carrying out any action likely to result in "the destruction or adverse modification" of that habitat without receiving a special exemption. ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2). To satisfy that prohibition, agencies must consult with the appropriate expert wildlife agency before any federal action that might affect critical habitat. *California ex rel. Lockyer v. U.S. Dep't. of Agric.*, 575 F.3d 999, 1018-19 (9th Cir. 2009). Although it designated the four crustacean species at issue here as endangered or threatened in 1994, FWS nevertheless declined to designate critical habitat at that time. FWS explained in the final rule designating the crustacean species that concurrent designation of critical habitat was "not prudent" because "such designation likely would increase the degree of threat from vandalism or other human activities." 59 Fed. Reg. at 48,151.

After FWS issued that final rule, a group of plaintiffs led by the Building Industry Association of Superior California challenged it in the District Court for the District of Columbia. The court rejected all of the plaintiffs' claims except their challenge to FWS's failure to designate critical habitat. The court ordered FWS to designate critical habitat, but before FWS could comply with the court's order, the plaintiffs struck the critical-habitat claim from their complaint so that they could take an immediate appeal from the denial of their other claims. *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1244 (D.C. Cir. 2001). A group of plaintiffs including some of the defendant-intervenor-appellees in this case brought a critical-habitat claim in the District Court for the Eastern District of California. They too were successful, and the court ordered FWS to designate critical habitat for the vernal pool crustaceans. *Butte Envtl. Council v. White*, 145 F. Supp. 2d 1180 (E.D. Cal. 2001).

FWS complied with that order, and on September 24, 2002 issued a proposed rule to designate 1,662,762 acres in northern California and southern Oregon as critical habitat for the vernal pool crustaceans as well as the eleven plant species. 67 Fed. Reg. 59,884 (Sept. 24, 2002). After extensive public comment, FWS issued a final designation on August 6, 2003. 68 Fed. Reg. 46,684 (Aug. 6, 2003). Based on those comments, the final designation reduced the covered area by more than one million acres.[2] The final designation reflected the exclusion of five rapidly growing counties for economic reasons as well as exclusions for non-economic reasons—areas already protected, military areas, and tribal areas. *Id.* at 46,745-55. Litigation once again followed—the plaintiffs again included some of the intervenors here—and, in October 2004, the District Court for the Eastern District of California granted FWS's motion for voluntary remand for reconsideration of the exclusions.[3]

On December 28, 2004, FWS reopened the comment period for thirty days to obtain comments on both the economic and non-economic exclusions. 69 Fed. Reg. 77,700 (Dec. 28, 2004). After reconsideration, FWS made no changes to the non-economic exclusions. 70 Fed. Reg. 11,140, 11,140 (Mar. 8, 2005). FWS's reconsideration of the economic exclu-

---

[2]Although FWS estimated that the August 2003 designation covered 1,184,513 acres, it acknowledged that the estimate did not reflect certain exclusions it had made. 68 Fed. Reg at 46,684. The parties challenging the designation estimated that when those extra exclusions were considered, the total reduction was more than one million acres, reducing the area designated as critical habitat to about 600,000 acres. The district court adopted that estimate.

[3]FWS's request for a voluntary remand appears to have been motivated by its own concerns about the internal process that led to the exclusions. U.S. Dep't of the Interior, Office of Inspector General, *Investigative Report: The Endangered Species Act and the Conflict between Science and Policy* 106-12 (Dec. 10, 2008), *available at* http://www.doioig. gov/images/stories/reports/pdf/Endangered%20Species%20FINAL%20 REDACTED5%20w_TOC_encryption.pdf (last visited July 7, 2010).

sions, however, did generate changes. As part of the reconsideration, FWS obtained a new economic analysis estimating the foreseeable economic impacts of the critical habitat designation. 70 Fed. Reg. 37,739, 37,741 (June 30, 2005). The analysis took a "baseline" approach: relying on guidance from the Office of Management and Budget, it compared the current state of affairs—the baseline—with how things would look after designation of critical habitat. CRA International, *Economic Impacts of Critical Habitat Designation for Vernal Pool Species* 45-46 (June 20, 2005), *available at* http://www.fws.gov/economics/Critical%20Habitat/Final%20 Draft%20Reports/vernal%20pool%20species%20redo/VPS-6-20-05.pdf (last visited July 7, 2010). Based on that analysis, on August 11, 2005, FWS adopted new economic exclusions to the critical habitat designation. 70 Fed. Reg. 46,924, 46,948-52 (Aug. 11, 2005). Rather than excluding land in five rapidly growing counties as before, the new designation excluded twenty-three census tracts[4] for which FWS determined that the benefits of exclusion outweighed the benefits of inclusion. *Id.* FWS issued its final rule on February 10, 2006, designating 858,846 acres of land as critical habitat. 71 Fed. Reg. 7118 (Feb. 10, 2006).

Once again, litigation followed in the District Court for the Eastern District of California, this time from both sides. Home Builders and a group of intervenors challenged the final critical habitat designation for going too far, while Butte Environmental challenged it for not going far enough. The district court ultimately granted summary judgment to FWS on Home Builders's challenge. On Butte Environmental's challenge, though, the court ruled that FWS failed to properly consider the issue of species conservation, in addition to spe-

---

[4]"Census tracts are relatively permanent small-area geographic divisions of a county or statistically equivalent entity defined for the tabulation and presentation of data from the decennial census and selected other statistical programs." 73 Fed. Reg. 13,836, 13,836 (Mar. 14, 2008) (footnote omitted).

cies survival, in violation of ESA as interpreted in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069-70 (9th Cir. 2004) (rejecting FWS's interpretation of "destruction or adverse modification" because it "reads the 'recovery' goal out of the adverse modification inquiry"). Accordingly, the district court remanded the designation for yet another reconsideration. While the remand was pending, Home Builders and the intervenors filed notices of appeal, which this court dismissed as premature under *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1184 (9th Cir. 2004). After the remand, which resulted in no substantive change to the designation, 72 Fed. Reg. 30,279 (May 31, 2007), the district court entered final judgment in favor of FWS, and Home Builders appealed. The plaintiff-intervenors also filed a notice of appeal but later dismissed it voluntarily. Butte Environmental did not file its own appeal from the district court's final judgment, but it has participated in this appeal as defendant-intervenor-appellee.

## DISCUSSION

Our review of the district court's grant of summary judgment is *de novo. Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 875 (9th Cir. 2009). Our review of FWS's decisions, however, is more deferential. Under the Administrative Procedure Act, we will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under that standard is narrow; we will not substitute our judgment for the agency's. *Tucson Herpetological Soc'y*, 566 F.3d at 875. Nevertheless, the agency must " 'state a rational connection between the facts found and the decision made.' " *Id.* (quoting *Gifford Pinchot*, 378 F.3d at 1065).

## I.   Use of Primary Constituent Elements (PCEs) in Critical Habitat Designation

[1] Home Builders's first challenge to the designation attacks FWS's classification, as critical habitat, of areas in

which the physical or biological features essential to the conservation of the species do not occur simultaneously. Those "physical or biological features" are part of the definition of occupied critical habitat: "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." ESA § 3(5)(A)(i), 16 U.S.C. § 1532(5)(A)(i). FWS refers to such "physical or biological features" as "primary constituent elements" or "PCEs." *See* 50 C.F.R. § 424.12(b). In the August 2005 Rule, FWS stated that "[t]he PCEs described for each species do not have to occur simultaneously within a unit for the unit to constitute critical habitat for any of the 15 vernal pool species." 70 Fed. Reg. at 46,934.

Without challenging any specific designations, Home Builders argues generally that if an area that does not contain all PCEs is designated as an occupied critical habitat, then the PCEs not present cannot be essential to the conservation of the species, so should not be considered PCEs at all. On the other hand, Home Builders continues, if the absent elements are truly PCEs, then their absence means that the area cannot be essential to the conservation of the species. Logic and the unique characteristics of vernal pool complexes defeat this argument.

**[2]** In vernal pool complexes, the elements necessary to species survival are present in distinct areas. For example, each of the crustacean species has four PCEs: certain topographic features that feed the pools, certain depressional features where the pools form, sources of food, and structures within the pool that provide shelter. 70 Fed. Reg at 46,934-37. Quite obviously, the topographical features that feed the pools and the depressional features where the pools form will be found in different areas. In general, there is simply no reason that two elements essential for the conservation of a species need be present in the same area. As FWS points out, one crit-

ical habitat for a bird species might contain nesting grounds while another critical habitat contains feeding sites. As explained, such a separation is especially appropriate for species that live in vernal pool complexes.

[3] Home Builders also makes the perverse contention that by designating as critical habitat areas with fewer than all PCEs, FWS has impermissibly *limited* its designation to protecting only those elements essential to the protected species' survival as opposed to their recovery. This part of the argument relies on this court's holding that "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery." *Gifford Pinchot*, 378 F.3d at 1070. Thus, *Gifford Pinchot* requires FWS to be *more* generous in defining area as part of the critical habitat designation. Home Builders's attempt to use the case in support of its argument that FWS should have included *less* area within the critical habitat designation makes no sense. *Gifford Pinchot* says nothing about how many PCEs must be included in an area for it to be classified as critical habitat. Accordingly, we find no legal support for Home Builders's argument.[5]

## II.   Identification of the Point at Which the Fifteen Species Will Be Conserved

[4] Home Builders next argues that FWS's determination of the PCEs is invalid because FWS failed to determine *when* the protected species will be conserved. ESA § 3(3) defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).

---

[5]Home Builders does not argue, and the record does not suggest, that FWS improperly designated critical habitat based on a goal of survival rather than what would be necessary to achieve conservation and recovery of the listed species.

If FWS does not know *when* the species in question will be brought to this point, Home Builders argues, it cannot know what physical or biological features are required to bring the species there. A district court adopted this argument in another case brought by Home Builders. *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 268 F. Supp. 2d 1197, 1214 (E.D. Cal. 2003). We disagree with that court's reasoning because it lacks legal support and is undermined by ESA's text.

**[5]** First, as the district court held in this case, there is no reason why FWS cannot determine what elements are necessary for conservation without determining exactly when conservation will be complete. *See also Arizona Cattle Growers' Ass'n v. Kempthorne*, 534 F. Supp. 2d 1013, 1025-26 (D. Ariz. 2008), *aff'd on other grounds*, 606 F.3d 1160 (9th Cir. 2010). As FWS explains, all that ESA § 3(5)(A) requires before the designation of occupied critical habitat is a determination of what physical or biological features are essential to the conservation of the species. 16 U.S.C. § 1532(5)(A). Home Builders does not explain why it is impossible to determine the elements essential to a goal without determining when the goal will be achieved. A seller of sporting goods should be able to identify which rod and reel are essential to catching a largemouth bass, but is not expected to predict when the customer will catch one.

Home Builders attempts to rely on ESA's text as support for adding this requirement, but the statute actually runs contrary to its argument. ESA does require a determination of criteria for measuring when a species will be conserved, but that requirement applies to the preparation of a recovery plan. ESA § 4(f)(1)(B)(ii), 16 U.S.C. § 1533(f)(1)(B)(ii). Recognizing that this case does not involve a challenge to a recovery plan, Home Builders urges us to import the requirement to the designation of critical habitat, a completely different part of ESA. Home Builders undermines its argument for importation by advocating it selectively: Home Builders urges that another

recovery plan requirement—providing a description of the management actions necessary to achieve conservation and survival—should not be imposed on critical habitat designations. ESA § 4(f)(1)(B)(i), 16 U.S.C. § 1533(f)(1)(B)(i). Home Builders's reasoning is that the second requirement "presumably would in most instances take considerable time and effort." Home Builders's argument for selective importation is an argument for Congress, not for the courts. Apart from its own preference, Homes Builders has not provided any valid reason to impose requirements from one part of the statute onto another.

[6] Indeed, inclusion of the requirement for recovery plans shows that if Congress had intended such a requirement to apply to critical habitat designations, it would have said so. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and alteration omitted). Finally, we note that Congress's decision to apply the extra requirement to recovery plans but not to critical habitat designations is logical because there is no deadline for creating a recovery plan, but there is a one-year deadline for designating critical habitat.

### III. Overlap Between Occupied and Unoccupied Habitat Designations

[7] Next, Home Builders contends that FWS erred by conflating the standards for occupied and unoccupied habitat. Although FWS described the protected habitat as being composed of "occupied" subunits, 70 Fed. Reg. at 46,945, it acknowledged that some areas that constitute unoccupied critical habitat will be present within some subunits, *id.* at 46,929, 46,934. Home Builders fails to explain how FWS's procedure here runs afoul of the statutory scheme. Under ESA § 3(5)(A), an area constitutes "critical habitat" if it meets the

requirements for occupied habitat or for unoccupied habitat. 16 U.S.C. § 1532(5)(A). There is no requirement that every area be classified as one or the other, and, in the case of vernal pool complexes, which may change dramatically from year to year, such a classification may be impossible. 70 Fed. Reg. at 46,929, 46,934.

**[8]** In any event, FWS ultimately concluded that "the areas designated by this final rule, including currently occupied and unoccupied areas, are essential for the conservation of these species." *Id.* at 46,930. Essential for conservation is the standard for unoccupied habitat, ESA § 3(5)(A)(ii), 16 U.S.C. § 1532(5)(A)(ii), and is a more demanding standard than that of occupied critical habitat. *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). Thus, basing the designation on meeting the more demanding standard poses no problem. Courts routinely apply similar reasoning in cases where a standard is unclear yet the result is the same under even the highest standard. *E.g., Brown v. S. Cal. IBEW-NECA Trust Funds*, 588 F.3d 1000, 1003 (9th Cir. 2009) ("Because we agree with the district court that the result would be the same under either standard of review, we likewise need not decide the question.").

## IV.    Textual Exclusion of Areas Without PCEs

Home Builders also challenges the critical habitat designation as based on what it believes are areas that were designated as critical habitat despite containing no PCEs. In the final rule, FWS explained that in designating critical habitat, it "made every effort to avoid designating developed areas such as buildings, paved areas, boat ramps and other structures that lack the PCEs for the 15 vernal pool species." 70 Fed. Reg. at 46,930. FWS acknowledged that its best efforts may not have resulted in perfection and that "[a]ny such structures inadvertently left inside critical habitat boundaries are not considered part of the unit." *Id.* Thus, federal actions limited to those areas would not require consultation with FWS

if the action did not affect the species or the PCEs in the adjacent critical habitat. *Id.*

**[9]** Home Builders's argument here is that the explicit textual exclusion of the structures from the critical habitat designation is improper and the need for such an exclusion shows that the designation failed to satisfy ESA's requirement that "specific areas" be designated. ESA § 3(5)(A), 16 U.S.C. § 1532(5)(A). FWS has interpreted this requirement in a regulation stating that "[e]ach critical habitat will be defined by specific limits using reference points and lines as found on standard topographic maps of the area." 50 C.F.R. § 424.12(c). To be sure, FWS could not designate critical habitat by saying merely "we designate all areas that constitute critical habitat under ESA § 3(5)(A)." That is hardly what FWS did in this case, however. FWS began with data from sources that included the final rules listing the fifteen species, other recovery plans, reports by biologists, and academic reports published in peer-reviewed journals. 68 Fed. Reg. at 46,712. FWS then delineated the critical habitat using Arc-View, a computer program that relies on Geographic Information System data drawn from numerous sources. *Id.* at 46,713. Next, FWS further refined the designation using "satellite imagery, watershed boundaries, geologic landform coverages, elevational modeling data, soil type coverages, vegetation/land cover data, and agricultural/urban land use data." *Id.* Despite those efforts, FWS acknowledged that some developed areas could have been included in the initial designation. 70 Fed. Reg. at 46,930. Even though the existence of such areas was purely hypothetical, FWS then excluded them with an explicit textual reference. *Id.*

**[10]** Home Builders does not suggest a method that might have produced a more precise delineation of the protected area. Instead, it argues that the textual exclusion was prohibited because the regulation, 50 C.F.R. § 424.12(c), defines the exclusive method for designating critical habitat. The regulation itself, however, contains no suggestion that it is exclu-

sive. And Home Builders fails to explain why we should not defer to the agency's interpretation of its own regulation, which, in the case of an ambiguous regulation, is controlling unless plainly erroneous or inconsistent with the regulation. *Chae v. SLM Corp.,* 593 F.3d 936, 948 (9th Cir. 2010) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). Home Builders also argues that, based on the need for that exclusion, FWS's procedure did not produce a designation that was sufficiently specific. As explained, though, Home Builders offers no alternative procedure and points to no infirmity in the procedure used except that it may not have been perfect. Specificity does not require perfection; ESA requires only that FWS designate critical habitat "on the basis of the best scientific data available." ESA § 4(b)(2), 16 U.S.C. § 1533(b)(2). Home Builders presents no valid reason not to defer to FWS on this issue.

## V.    Economic Impact Consideration

**[11]** Finally, Home Builders argues that FWS failed to properly account for the economic impact of its critical habitat designation. ESA mandates the consideration of economic impact before the designation of critical habitat. ESA § 4(b)(2), 16 U.S.C. § 1533(b)(2); *Bennett v. Spear*, 520 U.S. 154, 172 (1997). To fulfill that requirement, FWS obtained an economic analysis from an outside consultant that relied on guidance from the Office of Management and Budget to compare the current state of affairs—the baseline—with how things would look after designation of critical habitat. Our court recently rejected a challenge to FWS's "baseline" approach in *Arizona Cattle Growers'*, 606 F.3d at 1172-74. The challenger in that case, relying on an opinion of the Tenth Circuit, unsuccessfully argued that FWS should instead have used a "co-extensive" approach, which "would take into account all of the economic impact of the [critical habitat designation], regardless of whether those impacts are caused co-extensively by any other agency action (such as listing) and even if those impacts would remain in the absence of the [designation]." *New Mexico Cattle Growers Ass'n v. U.S. Fish &*

*Wildlife Serv.*, 248 F.3d 1277, 1283 (10th Cir. 2001). We declined to endorse that approach, explaining, "[t]he very notion of conducting a cost/benefit analysis is undercut by incorporating in that analysis costs that will exist regardless of the decision made." *Arizona Cattle Growers'*, 606 F.3d at 1173.

[12] In challenging the baseline approach here, Home Builders argues for a "cumulative" assessment that would include an assessment of the costs of complying with other regulations.[6] Such an assessment would be necessary under the National Environmental Policy Act ("NEPA"), which requires a cumulative impacts analysis in which the agency considers the environmental impact that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; *see Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005). NEPA and ESA, though, are different statutes. While NEPA's regulations expressly require consideration of cumulative impacts, 40 C.F.R. §§ 1508.25(a)(2), 1508.7, neither ESA nor its implementing regulations do so. Rather, the plain language of ESA directs the agency to consider only those impacts caused by the critical habitat designation itself. ESA § 4(b)(2), 16 U.S.C. § 1533(b)(2) (requiring the agency to consider "the economic impact . . . of specifying any particular area as critical habitat"). It is sensible to require a more thorough analysis under NEPA than under ESA. NEPA imposes requirements before the government takes action that might have negative consequences for the environment; ESA

---

[6]As with its other arguments, Home Builders fails to make this one with any specificity. The economic analysis on which FWS relied in this case *did* include consideration of compliance with other regulations such as local zoning laws and state natural resource laws. CRA International, *Economic Impacts of Critical Habitat Designation for Vernal Pool Species*, *supra*, at 46 (June 20, 2005). We can only guess which existing regulatory impacts Home Builders believes FWS failed to consider.

imposes requirements before the government takes action that will *protect* the environment.

Finally, Home Builders's position is contrary to *Arizona Cattle Growers*, 606 F.3d at 1172, where the court rejected the notion that "FWS was required to attribute to the critical habitat designation economic burdens that would exist even in the absence of that designation." That opinion also expressly approved the baseline approach to economic analysis, under which "any economic impacts of protecting the [listed species] that will occur regardless of the critical habitat designation . . . are treated as part of the regulatory 'baseline' and are not factored into the economic analysis of the effects of the critical habitat designation." *Id.* Beyond arguing that FWS failed to follow the requirements of statutory and regulatory provisions that have no application, Home Builders raises no other argument that anything was insufficient about FWS's consideration of the economic impact of its designation.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.