PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 19-2116

COMMONWEALTH OF PENNSYLVANIA

v.

NAVIENT CORP; NAVIENT SOLUTIONS LLC
                                        Appellants

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 3-17-cv-01814)
District Judge: Honorable Robert D. Mariani

Argued March 11, 2020

Before: McKEE, AMBRO, and PHIPPS, Circuit Judges

(Opinion filed: July 27, 2020)

Daniel T. Brier
Myers Brier & Kelly
425 Spruce Street, Suite 200
Scranton, PA  18503

James P. Brown
Jennifer Levy
Patrick Brown
Mike Kilgarriff
Kirkland & Ellis
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004

Michael Shumsky (Argued)
Hyman Phelps & McNamara
700 Thirteenth Street, N.W., Suite 1200
Washington, DC  20005

  Counsel for Appellants

Josh Shapiro
 Attorney General State of Pennsylvania
Howard G. Hopkirk (Argued)
 Senior Deputy Attorney General
Jesse F. Harvey
 Chief Deputy Attorney General
John Abel
 Senior Deputy Attorney General
Jill T. Ambrose
 Deputy Attorney General
Office of the Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA  17120

Nicholas Smyth
 Senior Deputy Attorney General
Office of Attorney General of Pennsylvania

1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA  15222

      Counsel for Appellee

Mary McLeod
  General Counsel
John Coleman
  Deputy General Counsel
Steven Y. Bressler
  Assistant General Counsel
Lawrence Demille-Wagman
  Senior Litigation Counsel
Christopher Deal (Argued)
Consumer Financial Protection Bureau
1700 G Street, N.W.
Washington, DC  20552

      Counsel for Amicus Appellee
      Consumer Financial Protection Bureau

Faith E. Gay
Maria Ginzburg
Yelena Konanova
Margaret Larkin
Ryan W. Allison
Selendy & Gay
1290 Avenue of the Americas, 17th Floor
New York, NY  10104

Mark Richard
Phillips, Richard & Rind, P.A.
9360 S.W., 72nd Street, Suite 283

Miami, FL  33173

        Counsel for Amicus Appellee
        American Federation of Teachers

Letitia James
    Attorney General State of New York
Barbara D. Underwood
    Solicitor General
Steven C. Wu
    Deputy Solicitor General
Ester Murdukhayeva
    Assistant Solicitor General of Counsel
Office of Attorney General of New York
28 Liberty Street, 23rd Floor
New York, NY  10005

        Counsel for Amicus Appellee
        State of New York

Jon Greenbaum
Lawyers' Committee for Civil Rights Under Law
1500 K Street, N.W., Suite 900
Washington, DC  20005

        Counsel for Amicus Appellee
        Lawyers Committee for Civil Rights Under Law

Benjamin J. Roesch
Jensen Morse Baker
1809 Seventh Avenue, Suite 410
Seattle, WA  98101

Counsel for Amicus Appellees
Student Borrower Protection Center; Seniorlaw
Center; Center for Responsible Lending; New Jersey
Citizen Action; Lawyers Committee for Civil Rights
Under Law; Community Legal Services of
Philadelphia

––––––––––––

OPINION OF THE COURT

––––––––––––

AMBRO, <u>Circuit Judge</u>

We decide two issues in this appeal: first, whether the Commonwealth of Pennsylvania may bring a parallel enforcement action against Navient Corporation and Navient Solutions, LLC (together, "Navient") under the Consumer Financial Protection Act of 2010 (the "Consumer Protection Act"), codified in relevant part at 12 U.S.C. § 5552, after the Consumer Financial Protection Bureau (the "Bureau") has filed suit; and second, whether and to what extent the federal Higher Education Act of 1965 (the "Education Act"), 20 U.S.C. § 1001 *et seq.*, preempts the Commonwealth's loan-servicing claims under its Unfair Trade Practices and Consumer Protection Law (the "PA Protection Law"), 73 Pa. Cons. Stat. §§ 201-1 to 201-9.3.

We hold that the plain language of the Consumer Protection Act permits the Commonwealth's concurrent action. And we follow our sister Circuits in holding that although the preemption provision of the Education Act preempts claims based on failures to disclose information as required by the statute, it does not preempt claims based on affirmative misrepresentations. *See Lawson-Ross v. Great*

5

*Lakes Higher Educ. Corp.*, 955 F.3d 908, 911 (11th Cir. 2020); *Nelson v. Great Lakes Educ. Loan Servs., Inc*., 928 F.3d 639, 642 (7th Cir. 2019). *Cf. Chae v. SLM Corp*., 593 F.3d 936 (9th Cir. 2010). As the Commonwealth's claims under the PA Protection Law based on affirmative misrepresentations and misconduct are not preempted, we affirm the District Court's denial of Navient's motion to dismiss.

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

Congress enacted the Education Act in order "to keep the college door open to all students of ability, regardless of socioeconomic background." *Bible v. United Student Aid Funds, Inc*., 799 F.3d 633, 640 (7th Cir. 2015) (citation omitted). To that end, the Act established two federal student loan programs that are designed to help every student afford the college or trade school of his or her choice: (i) the Direct Loan Program, under which the Department of Education (the "DOE") lends federal taxpayer dollars directly to student borrowers, *see* 20 U.S.C. § 1087a *et seq*.; and (ii) the Federal Family Education Loan Program (the "Indirect Loan Program"), under which the federal Government guarantees privately funded loans to student borrowers, *see* 20 U.S.C. § 1071 *et seq*.

The federal Government does not directly administer these loan programs. The DOE contracts with third parties like Navient to administer and service loans under the Direct Loan Program and imposes contractual requirements that govern what servicers may do when acting on the DOE's behalf. For both Direct Loan Program and Indirect Loan Program loans, the DOE has promulgated comprehensive regulations that control the student loan process, including the types of charges that are permitted, *see* 34 C.F.R. § 682.202; the kinds of

repayment plans that are available, *see* §§ 682.209, 685.208; and the ways in which those plans can be restructured, *see* §§ 682.210–11, 685.204–05.

Federal student loans are eligible for several types of deferred payment plans to help borrowers avoid defaulting. Servicers may grant a "forbearance" to borrowers having financial trouble during the repayment period. This "permit[s] the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously were scheduled." § 682.211(a)(1). The DOE's regulations specify the circumstances under which a loan servicer may offer forbearance. *See, e.g.*, §§ 682.211(a)(2), 685.205. Borrowers who enter forbearance face significant costs, such as, among other things, having their monthly payments increase due to accumulated unpaid interest.

DOE regulations dictate how loan issuers and servicers must communicate with borrowers about forbearance. Lenders and servicers must make extensive disclosures, including those related to fees and repayment options, at many stages of a loan's lifecycle: "before disbursement," 20 U.S.C. § 1083(a); "before repayment," § 1083(b); "during repayment," § 1083(e); to "a borrower having difficulty making payments," § 1083(e)(2); and to "a borrower who is 60 days delinquent in making payments on a loan," § 1083(e)(3). Before placing borrowers into forbearance, loan servicers must disclose its terms, including that deferred interest will be capitalized. *See* §§ 1083(a)(6)(B), 1083(e)(2); *see also* § 1087e(p); 34 C.F.R. § 682.211. Servicers must repeat that disclosure within 30 days of granting forbearance and must disclose every 180 days during the forbearance period. *See* §§ 1083(b), 1087e(p); 34 C.F.R. § 682.211(e)(2).

7

In addition to forbearance, loan servicers offer an array of alternate repayment plans, referred to as Income-Driven Repayment ("IDR") plans, when borrowers encounter difficulties during the repayment period, each with varying qualification requirements and repayment provisions plans. Borrowers who enter an IDR plan do not defer payments entirely but instead adjust their monthly payments. To qualify for IDR, borrowers must fill out a federal application, submit supporting documents, and then recertify their income and family size annually. 34 C.F.R. §§ 682.215(e), 685.221(e).

As with forbearance, federal law details what, when, and how loan servicers must communicate with borrowers regarding the availability of IDR. *See* 20 U.S.C. § 1087e(p); 34 C.F.R. § 682.205(e). Once repayment begins, if "a borrower . . . has notified the lender that the borrower is having difficulty making payments," the servicer must provide a written disclosure "in simple and understandable terms" that details both the expected costs associated with forbearance if the borrower chooses that option, and instructions for seeking IDR if a student borrower seeks an alternative to forbearance. 20 U.S.C. § 1083(e)(2) (Indirect Loan Program); *see also* § 1087e(p) (Direct Loan Program).[1]

---

[1] In addition, among other disclosures, federal law requires lenders and loan servicers to disclose: the availability of IDR when the loan is disbursed and before repayment begins, §§ 1083(a)(11), (b)(6); 34 C.F.R. § 682.205(a)(2)(xii) (Indirect Loan Program); § 1087e(p) (Direct Loan Program); the availability of, and procedures for enrolling in, IDR before repayment begins, 20 U.S.C. § 1077(a)(2)(H); 34 C.F.R. § 682.205(e) (Indirect Loan Program); 20 U.S.C. §§ 1087e(d)(1)(D)–(E), 1087e(p) (Direct Loan Program); and the specified information regarding IDR on every statement

DOE regulations also require that loan servicers provide oral disclosures regarding forbearance and IDR at other times. When a defaulted borrower orally requests a forbearance, the servicer must "orally review with the borrower the terms and conditions of the forbearance, including the consequences of interest capitalization, and all other repayment options available to the borrower," and must send a written notice with similar information. 34 C.F.R. §§ 682.211(d)(iii), 685.205(a)(8). DOE regulations do not require federal loan servicers to disclose the availability of IDR on each phone call. Federal law does require that multiple written or electronic notices and disclosures be provided to borrowers, including with each bill or statement. 20 U.S.C. §§ 1083(e)(1) (Indirect Loan Program), 1087e(p) (Direct Loan Program).

The Education Act grants the DOE broad discretion to regulate these loan programs, *see, e.g.*, § 1082(a)(1), and expressly requires the DOE to "prescribe standardized forms and procedures regarding" deferments, forbearance, and servicing, § 1082(I)(1)(D)–(F). These standardized procedures must "include all aspects of the loan process," § 1082(I)(2)(A), "be designed to minimize administrative costs and burdens," *id.*, and standardize and simplify procedures related to servicing, § 1082(I)(3)(A).[2]

---

sent to the borrower, including "a reminder that the borrower has the option to change repayment plans," and a link to the DOE's IDR website, 20 U.S.C. § 1083(e)(1)(I); 34 C.F.R. § 682.205(a)(3)(ix) (Indirect Loan Program); § 1087e(p) (Direct Loan Program).

[2] In the last decade, the federal Government considered steps to promote awareness of IDR. For example, a 2012 Presidential Memorandum noted that "too few borrowers are

## B.  Navient's Conduct

### 1.  Loan-Originating Related Conduct

Navient has been "engaged in trade and commerce by offering, selling, marketing and promoting student loans to borrowers and by servicing and collecting on borrowers' student loans."  App. 105.[3]  From 2004 until 2014, Navient's predecessors also were engaged in that business.[4]

---

aware of the options available to them to help manage their student loan debt, including reducing their monthly payment through [IDR] . . . ."  *See* The White House, June 7, 2012 Memorandum on Improving Repayment Options for Federal Student Loan Borrowers, 77 Fed. Reg. 35,241 (June 13, 2012), https://tinyurl.com/y5o39q4z.  In July 2016, the DOE proposed that federal regulations should be amended to require that federal loan servicers employ "staff who receive enhanced training related to repayment and forgiveness options," and who in turn would (A) "assess the borrower's long-term and short-term financial situation and consider all available information about the borrower's income and family size," and (B) "discuss the concept of [IDR] plans" with struggling borrowers.  DOE, Policy Direction on Federal Student Loan Servicing (July 20, 2016), https://tinyurl.com/yxnkrava.  In 2017, however, the DOE decided not to implement the proposed regulatory changes.  *See* Letter from Secretary of Education re Student Loan Servicer Recompete (Apr. 11, 2017), https://tinyurl.com/y2v2m8uq.

[3] The alleged facts recounted herein are drawn from the Commonwealth's complaint.

Until 2007, many school financial aid offices maintained a preferred lenders list to give students guidance in choosing between different lenders. Navient attempted to place itself at the top of those lists to obtain access to schools' potential borrowers. Navient marketed custom loan packages to schools, including Indirect Loan Program loans, private loans for borrowers who qualified for Navient's standard private student loan products ("prime loans"), and private loans for students who did not qualify for standard private student loans ("subprime loans"). This benefited schools by maximizing enrollment and Navient by giving it a greater share of the market.

Subprime loans typically had high variable interest rates and high origination fees. Student borrowers who took out subprime loans were not informed that the loans were part of a subprime lending program and had a high likelihood of default. Navient internally described this strategy as "Current Strategy is Working: —Use subprime to win school deals and secure [Indirect Loan Program] and standard private volume—View economics on an all-in basis." App. 119. A 2007 internal email describes one of Navient's subprime loan programs as "the baited hook to gain [Indirect Loan Program] volume." App. 119.

Navient allegedly loosened its required credit criteria so that subprime borrowers could qualify without knowing the

_____

[4] In 2014, Navient assumed the liabilities of its predecessors—SLM Corporation and Sallie Mae, Inc.—and took over their student loan servicing and debt collection business. The action against Navient includes conduct by those predecessors. For convenience, we refer to Navient, rather than its predecessors, during the time periods the latter entities were involved.

11

true risk of default. Between 2000 and 2006 there was a substantial increase in the number of high-risk subprime loans made by Navient to students attending schools with a less than a 50% graduation rate and to students with credit scores of less than 640. From 2000 to 2007, between 68% and 87% of Navient's high-risk loans defaulted.[5]

### 2. Loan Servicing-Related Conduct

#### a. Navient Allegedly Steered Borrowers into Forbearance.

Navient allegedly has encouraged borrowers repeatedly to communicate with its representatives for assistance, only to steer them into forbearance rather than more affordable alternatives like IDR plans. The Commonwealth argues that this was done because enrolling a borrower in forbearance can be completed in a few minutes without paperwork, while enrolling in an IDR plan requires the submission of paperwork

---

[5] In their Amicus Curiae brief, New York and its joining States allege widespread abuses by servicers like Navient that have harmed millions of borrowers by impeding their access to IDR plans and public-service loan-forgiveness programs. For example, an investigation by Illinois into Navient found that it routinely steered consumers into forbearances rather than IDR plans. California alleges that Navient misled struggling borrowers about the amount needed to bring their accounts current and induced them into making unnecessarily high payments. California, Washington, and Mississippi have sued Navient for these and other deceptive practices. The Attorneys General for Colorado, Kansas, Oregon, New Jersey, New York, and the District of Columbia have also issued civil investigative demands to Navient. Amicus Curiae Br. for States of New York et al. 7–13.

and annual recertification, and Navient representatives were compensated based on average call time. Hence enrolling borrowers in IDR plans was costly.

Navient allegedly enrolled many borrowers into multiple consecutive forbearances even though they had demonstrated a long-term inability to repay their loans. For instance, between January 2010 and March 2015, Navient enrolled more than 1.5 million borrowers in multiple consecutive forbearances instead of helping them enroll in an IDR plan. During the same time period, the number of borrowers that Navient enrolled in forbearance generally exceeded the number of borrowers enrolled in IDR plans. Navient representatives would sometimes place borrowers in voluntary forbearance even though they would have qualified for $0 per month payments in an IDR plan. Navient also unnecessarily placed borrowers in forbearance before ultimately placing them in an IDR plan. The majority of IDR plan participants were enrolled in forbearance for more than three months before ultimately being enrolled in an IDR plan. This resulted in borrowers being adversely affected by the addition of interest to the loan's principal and losing credit for months that would have been counted toward loan forgiveness.[6]

---

[6] Amici Curiae the Student Borrower Protection Center and joining organizations state that approximately 43 million people owe over $1.4 trillion on their federal student loans. Amici argue that "the consequences of servicers' misconduct can be catastrophic for struggling borrowers' . . . lives." Amicus Curiae Br. for Student Borrowers Protection Center et al. 2–3. They further contend that older borrowers, facing limited and declining income and less access to technology, and borrowers of color (who are over-represented in the

### b. Issues with Recertification of IDR Plans

Between July 2011 and March 2015, more than 60% of Navient's borrowers who enrolled in IDR plans failed timely to renew their enrollment. From January 2010 to December 2012, Navient's annual renewal notices for IDR plans (sent via U.S. mail) allegedly did not provide notice of the actual date by which renewal applications had to be submitted. The notices stated that the IDR period would expire in "approximately 90 days" and that the "renewal process may take at least 30 days" to complete. App. 139. The Commonwealth alleges that the notices failed to advise borrowers of the negative consequences of submitting an

---

student bodies of predatory for-profit schools), are disproportionately affected by servicer misconduct. *Id*. at 3–4. It thus "systematically strips wealth from . . . communities which are already economically disadvantaged." *Id*. at 18.

Amicus Curiae the American Federation of Teachers ("AFT") argues that Navient's alleged schemes have especially affected the long-term cost of student loans for public servants, like AFT members, many of whom would be on track for the Public Student Loan Forgiveness program (the "Loan Forgiveness Program"), but who were steered into forbearance by Navient. "Congress created the [Loan Forgiveness Program] in 2007, promising to forgive the complete balance of federal student loan debt for any public employee who makes 120 on-time payments on a qualifying repayment plan." Amicus Curiae Br. for AFT at 5. Yet, as a result of servicers' misconduct, public employees steered into forbearance by servicers made fewer qualifying payments even as unpaid interest accumulated on their account. *Id.* at 7–16.

untimely or incomplete application and of having a break in their enrollment in an IDR plan (including an immediate increase in monthly payments, accrued interest being added to their loan principal, loss of interest subsidies, and delays in loan forgiveness).

Between mid-2010 and March 2015, some borrowers had to log into an electronic portal using their username and password to view the notices. Seventy-five percent of Navient's federal loan borrowers agreed to receive electronic communications. Borrowers were sent an e-mail with a hyperlink to Navient's website. However, the e-mail did not provide any indication of the purpose of the notice.

### c. Misrepresentations Related to Cosigner Releases

A cosigner is generally required for a borrower to obtain a private student loan. After a borrower begins repayment, he or she can usually apply to release the cosigner after meeting eligibility criteria. As of January 2010, one of the eligibility criteria is that the borrower makes a minimum number of "consecutive, on-time payments." When a borrower makes multiple payments at one time, Navient applies the payment for the current month and then places the borrower in a "paid ahead" status for subsequent months. App. 144. The borrower is then sent a bill for $0 for the subsequent months covered by the excess payment. However, until mid-2015, Navient allegedly treated these "non-payments" as a failure to make consecutive payments, reset the clock, and considered the consecutive on-time monthly payments as being zero. This increased the number of consecutive payments necessary to release a cosigner. Nothing on Navient's website, billing statements, or other documents provided to borrowers indicated that that the clock would be reset.

15

### d. Repeated Payment Processing Errors

The Commonwealth alleges that, since at least 2011, many borrowers have complained that Navient has misallocated or misapplied submitted payments, resulting in borrowers and cosigners being improperly charged late fees and increased interest charges, and in inaccurate negative information being furnished to consumer reporting agencies. Many borrowers have complained that, even after getting Navient to correct an error, the same payment-processing errors occurred repeatedly. Navient has allegedly failed to correct these recurring problems.

### C. Procedural History

In October 2017, the Commonwealth filed a complaint against Navient alleging its actions in originating and servicing student loans constitute unfair, deceptive, and abusive practices in violation of both the Consumer Protection Act and the PA Protection Law. The complaint contained nine counts: Count I under the PA Protection Law for unfairly and deceptively originating risky, expensive loans, which had a high likelihood of default, among other unlawful conduct; Count II under the PA Protection Law for steering borrowers suffering long-term financial hardship into costly forbearances; Count III under the Consumer Protection Act for steering borrowers suffering long-term financial hardship into costly forbearances; Count IV under the PA Protection Law for loan servicing failures related to recertification of IDR plans; Count V under the Consumer Protection Act for loan servicing failures related to recertification of IDR plans; Count VI under the PA Protection Law for misrepresentations relating to cosigner releases; Count VII under the Consumer Protection Act for misrepresentations relating to cosigner releases; Count VIII under the PA Protection Law for repeated payment-

16

processing errors; and Count IX under the Consumer Protection Act for repeated payment-processing errors.

Nine months before the Commonwealth filed its suit, in January 2017, the Bureau, the State of Illinois, and the State of Washington filed similar lawsuits alleging, among other things, that Navient failed to disclose adequately the availability of IDR programs to federal student loan borrowers. *See* Compl., *Consumer Fin. Prot. Bureau v. Navient Corp., et al.*, No. 17-cv-101, 2017 WL 191446 (M.D. Pa., filed Jan. 18, 2017); Compl., *Illinois v. Navient Corp., et al.*, No. 2017-CH-00761, 2017 WL 374522 (Ill. Cir. Ct., filed Jan. 18, 2017); Compl., *Washington v. Navient Corp., et al.*, No. 17-2-01115-1 SEA (Wash. Super. Ct., filed Jan. 18, 2017). Navient alleges that the Commonwealth's claims are "a virtual cut-and-paste of the [Bureau]'s . . . . complaint." Navient Br. 21. It admits that the Commonwealth's complaint differs in that it challenges (A) the pre-2007 loan origination practices of Navient's corporate predecessor (Count I), and (B) Navient's alleged "fail[ure] to disclose a date certain by which a borrower must submit materials to recertify an [IDR] plan," App. 155–56 (Count IV); Navient Br. 22.

In December 2017, Navient filed a motion to dismiss the complaint for failure to state a claim. The District Court denied the motion in its entirety. *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018). First, it rejected Navient's argument that the Consumer Protection Act precluded a concurrent lawsuit by Pennsylvania, and it held that Section 5552(a)(1) of the Consumer Protection Act, 12 U.S.C. § 5552(a)(1), unambiguously confers a right on state attorneys general to file suit to enforce the Consumer Protection Act, and that there is nothing in the Act that would bar a parallel state action. *Id.* at 543–47. Second, the Court rejected Navient's preemption argument and concluded that the Commonwealth's claims survived under both express-

17

preemption and conflict-preemption principles. It held that the Commonwealth's claims were not an attempt to impose disclosure requirements on Navient, but were instead distinct allegations of unfair and deceptive business practices brought pursuant to Pennsylvania's traditional state police powers. *Id.* at 548–52. It then ruled that conflict preemption did not apply because uniformity was not an express goal of Congress in enacting the Education Act and, even if it were, this goal is not defeated by allowing the Commonwealth to enforce its consumer protection laws. *Id*. at 553.

The District Court certified to us three questions of law for interlocutory appeal under 28 U.S.C. § 1292(b), *see Pennsylvania v. Navient Corp.*, No. 17-cv-1814, 2019 WL 1052014 (M.D. Pa. Mar. 5, 2019), and we granted permission to appeal two of them, specifically: (1) whether the Commonwealth may bring a parallel enforcement action under the Consumer Protection Act after the Bureau has filed suit; and (2) whether the Education Act preempts the Commonwealth's loan-servicing claims under the PA Protection Law.

## II.    DISCUSSION[7]

### A.    The Consumer Protection Act Permits Concurrent State Claims.

Navient argues that that Consumer Protection Act does not allow the state attorney general to bring a "copycat" claim

---

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction pursuant to 28 U.S.C. § 1292(b), as we certified two questions of law for interlocutory appeal. "When reviewing an interlocutory appeal under 28 U.S.C. § 1292(b), we exercise plenary review over the question certified." *Barbato v. Greystone All., LLC*, 916

"on behalf of the same borrowers, against the same defendants, for the same alleged conduct." Navient Br. 25. Navient acknowledges that the Consumer Protection Act expressly permits state attorneys general to file Consumer Protection Act claims, but argues that they may only do so where the Bureau itself has not filed a lawsuit. To support this interpretation, Navient cites the Consumer Protection Act's requirement that state attorneys general notify the Bureau before filing those claims and its grant of authority for the Bureau to intervene in states' lawsuits.

1. **The Plain Meaning of the Consumer Protection Act Permits State Concurrent Actions.**

The plain language of the Consumer Protection Act permits state concurrent actions. Section 5552 provides that "the attorney general . . . of any State may bring a civil action . . . to enforce provisions of this title . . . and to secure remedies under provisions of this title or remedies otherwise provided under other law." 12 U.S.C. § 5552(a)(1). Courts typically do not look beyond statutory language where the meaning is clear. *Valansi v. Ashcroft*, 278 F.3d 203, 209 (3d Cir. 2002). They "may look behind a statute only when the plain meaning produces a result that is not just unwise but is clearly absurd." *In re Visteon Corp.*, 612 F.3d 219, 220 (3d Cir. 2010) (citation and internal quotation omitted). Here the plain meaning of

F.3d 260, 264 (3d Cir. 2019) (citation omitted). In reviewing a motion to dismiss, we likewise review any legal determinations anew and presume that a complaint's factual allegations are true. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

§ 5552 is that the Pennsylvania attorney general may bring an action to enforce the Consumer Protection Act.

Other provisions of the Consumer Protection Act do expressly prohibit concurrent claims, but not § 5552. Thus, under the canon of statutory construction announced in *Russello v. United States*, 464 U.S. 16 (1983), "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id*. at 23 (citation omitted). Three other provisions of the Consumer Protection Act prohibit concurrent claims. Section 5514 prohibits the FTC or the Bureau from filing a civil action against a defendant if the other agency has previously filed an action against the same defendant based on the same "provision of law" and "any violation alleged in the complaint." 12 U.S.C. § 5514(c)(3)(B)(i). Section 5515 grants the Bureau primary enforcement authority over "very large" depository institutions and provides "[b]ackup enforcement" for the other federal bank regulators to act if the Bureau does not. § 5515(c)(3). And § 5538 provides for a state's right of action to enforce mortgage rules promulgated by the Bureau, but contains an explicit bar on concurrent actions by states when the Bureau has already filed its own action against a party. § 5538(b)(6).

Thus, even if the language of § 5552(a)(1) were ambiguous—and it is not—a court should presume that Congress's omission of an explicit prohibition against concurrent claims from § 5552(a)(1) was intentional because Congress explicitly prohibited concurrent claims in three nearby sections of the statute.

20

### 2. The Consumer Protection Act's Pre-Suit Notice Requirement

Navient correctly points out that after initially granting state attorneys general a right to file Consumer Protection Act claims in § 5552(a), the Consumer Protection Act subjects that general grant of authority to a limitation: it provides that "[b]efore initiating any action," the relevant state attorney general "shall timely provide a copy of the complete complaint to be filed and written notice describing such action or proceeding to the Bureau." 12 U.S.C. § 5552(b)(1)(A). In addition to requiring the state attorney general to detail "the alleged facts underlying the proceeding," § 5552(b)(1)(C)(ii), the statute requires that official to address "whether there may be a need to coordinate the prosecution of the proceeding so as not to interfere with *any action*, including any rulemaking, undertaken by the Bureau," § 5552(b)(1)(C)(iii) (emphasis added).

Navient would have us stretch too far the meaning of this pre-suit notice requirement. It argues that state-sponsored Consumer Protection Act claims are intended solely to address factual allegations and legal theories of which the Bureau is not aware or which are not already subject to a pending Bureau lawsuit. It suggests that in § 5552(b)(1)(C)(iii) "any action" refers only to rulemaking and not to other judicial proceedings. This fails. If Congress had intended to limit the phrase "action" in § 5552(b)(1)(C)(iii) to mean only "rulemaking," it could have drafted a simpler provision. Reading "action" to mean "rulemaking" only would render the words "any action, including" mere surplusage. *Cf. United States v. Miller*, 527 F.3d 54, 62–63 (3d Cir. 2008).

Moreover, the word "including" "is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration." *In re Fed. Mogul-*

*Global, Inc*., 348 F.3d 390, 401 (3d Cir. 2003) (citation omitted). And Congress twice used the phrase "any action" in a manner that includes litigation in a nearby provision: (1) in the pre-suit notice provision itself, § 5552(b)(1)(A) ("[b]efore initiating any action in court"), and (2) in § 5531(a) (the Bureau "may take any action authorized under part E").

Navient also argues that § 5552(b)(1)'s notice requirement would be superfluous if parallel actions were allowed because if the Bureau files a suit, then it knows the underlying facts such that there is no need for notice. This too fails. First, there are many ways in which a parallel state action could interfere with the Bureau's suit and require coordination. For example, there could be conflicting discovery schedules, conflicting legal theories, or competing settlement offers. And even if there is no conflict between the actions, the Bureau benefits from the notice requirement because it could use the information to identify additional victims or wrongs, to coordinate strategies with the state, or alternatively to drop certain counts from its own complaint because the issues will be adequately addressed by the state. Amicus Curiae Br. of the Bureau 19–20.

Thus, the Consumer Protection Act's pre-suit notice requirement does not negate the statute's express authorization of parallel state actions.[8]

---

[8] Navient also relies on a not relevant out-of-circuit district court case, *Navajo Nation v. Wells Fargo & Co*., 344 F. Supp. 3d 1292 (D.N.M. 2018), where the Court dismissed Consumer Protection Act claims filed by a tribal government when the Bureau had already settled similar claims. *Navajo Nation* is distinguishable because it was dismissed as *res judicata*. *Id.* at 1308. Nothing in it suggests an implied

22

### 3. The Consumer Protection Act's Intervention Provision

Navient does correctly point out that the Bureau is authorized to intervene as a party-plaintiff in any state-filed Consumer Protection Act litigation. 12 U.S.C. § 5552(b)(2)(A). It argues that the intervention provision demonstrates that Congress intended to prevent concurrent state claims. Yet it fails to cite any case law supporting that, where a statute allows third-party intervention, concurrent claims are barred. And indeed, Congress has enacted numerous statutes that authorize state enforcement while limiting concurrent claims in some way and numerous statutes that authorize state enforcement without limiting concurrent claims. *Compare* 15 U.S.C. § 6103(d) *with* 49 U.S.C. § 14711. That the Consumer Protection Act allows for the Bureau to intervene does not clearly decide whether concurrent claims are permitted.

Navient further asserts that allowing concurrent claims would also run headlong into the rule against claim-splitting—the longstanding bar against having a single party-plaintiff simultaneously maintain two actions against the same defendant. *See, e.g.*, *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (*en banc*). However, cases like *Walton* are distinguishable. There, a single plaintiff filed two separate employment lawsuits based on the same underlying facts, in the same court, against the same defendant. *Id.* at 69–70. In contrast, Pennsylvania and the Bureau are two separate plaintiffs with two different lawsuits. Pennsylvania's lawsuit

prohibition on concurrent claims under the Consumer Protection Act.

is intended to protect the public from and remediate violations of both Pennsylvania and federal laws.[9]

### 4. Judicial Resources

Navient also argues that allowing Pennsylvania's concurrent claims will be a waste of judicial resources because they, "by definition, cannot achieve anything that the [Bureau's] own lawsuit cannot achieve, no matter how well the state litigates its . . . claims." Navient Br. at 49. This argument falters for at least three reasons. First, even if the Bureau litigates this case through trial and obtains a judgment, it is possible that Pennsylvania could still achieve outcomes beyond what the Bureau achieves. For example, the Commonwealth could find witnesses and facts that persuade the court to order relief beyond that obtained by the Bureau. Second, Pennsylvania and other states have a fundamental right to protect their citizens and prevent harmful conduct from occurring in their jurisdictions. The interests of the states and the Bureau may not always be completely aligned. And third, states may be able to pick up slack when the federal

---

[9] The parties also dispute whether the Commonwealth and Bureau actions can be consolidated and the significance of that possibility. Navient argues that given the nine-month gap in the bringing of the cases and the vast disparity in the respective procedural postures, it would be impossible to consolidate these cases, and at best one action could be stayed until the other is resolved, at which point most issues in one suit would be resolved by prior decisions in the other case. This argument is a distraction. Navient can only speculate as to what will happen if both actions proceed. It is not clear to what extent issue preclusion will apply. Moreover, that this particular case may not be suitable for consolidation does not change the plain meaning of the statute.

24

Government fails to enforce and regulate. If the Bureau were under pressure to settle or withdraw its lawsuit,[10] states would still be free to protect the rights of consumers in their states.

The District Court correctly rejected Navient's argument that allowing concurrent claims would overburden the courts, because although "federal courts are indeed inundated with cases, adjudicating this case is a burden the Court is required to assume, absent a recognized statutory or procedural basis that precludes the Commonwealth from bringing its action." *Navient*, 354 F. Supp. 3d at 546.

Accordingly, we hold that the clear statutory language of the Consumer Protection Act permits concurrent state claims, for nothing in the statutory framework suggests otherwise.[11]

---

[10] Indeed, Navient's CEO has lobbied the Bureau to drop its lawsuit. "Navient CEO Met with CFPB as Company Seeks to End Lawsuit," Politico, June 28, 2018, https://www.politico.com/newsletters/morning-education/2018/06/28/kennedy-resignation-could-spark-changes-to-affirmative-action-266608.

[11] Navient also raises several constitutional arguments not raised before the District Court that go far beyond the questions certified by us for interlocutory appeal. The Commonwealth correctly points out that Navient cannot bring a freestanding constitutional challenge for the first time in this interlocutory appeal. *See Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 352 (3d Cir. 2014) (stating that an issue not raised in the district court is waived unless manifest injustice would result). We accordingly do not address its constitutional arguments at this stage.

**B. The Education Act Does Not Preempt the Commonwealth's Claims Under the PA Protection Law.**

Navient claims that Section 1098g of the Education Act both expressly and impliedly preempts the Commonwealth's state-law claims. We disagree and follow our sister Circuits in holding that the Education Act expressly preempts only claims based on failures of disclosure, not claims based on affirmative misrepresentations, and that no other preemption principles bar the Commonwealth's claims. *See Lawson-Ross*, 955 F.3d at 911; *Nelson*, 928 F.3d at 648.

**1. Preemption and the Presumption Against Preemption**

The Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, invalidates any state law that "interferes with or is contrary to federal law[.]" *Free v. Bland*, 369 U.S. 663, 666 (1962). While not "rigidly distinct" categories, there are three classes of preemption: (1) express preemption, (2) conflict preemption, and (3) field preemption. *Va. Uranium, Inc. v. Warren,* 139 S. Ct. 1894, 1901 (2019) (*quoting Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000)); *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

Express preemption applies where Congress explicitly preempts state law in the statutory language. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Conflict preemption occurs "when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Id.* (internal

26

citations and quotations omitted).  Field preemption focuses on when Congress does not expressly preempt state law but where "'federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law' in that field." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016) (citation omitted).  "Where Congress expresses an intent to occupy an entire field, States are foreclosed from adopting any regulation in that area, regardless of whether that action is consistent with federal standards." *Id*.  Each mode of preemption serves the same underlying function: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Coll. Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018).

"In every preemption case, our inquiry is guided by two principles.  First, the intent of Congress is the 'ultimate touchstone' of preemption analysis." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  In discerning congressional intent, we look to the "structure and purpose of the statute as a whole, as revealed not only in the text, but through the . . . way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Lohr*, 518 U.S. at 486 (internal citation omitted).  "Second, we 'start[ ] with the basic assumption that Congress did not intend to displace state law.'" *Farina*, 625 F.3d at 116 (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Lohr*, 518 U.S. at 485.  The presumption applies with particular force when the state is exercising its police power. *Id.*

**2.      Section 1098g Does Not Expressly Preempt the Commonwealth's Claims Under the PA Protection Law.**

Section 1098g provides that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act . . . shall not be subject to *any* disclosure requirements of *any* State law."  20 U.S.C. § 1098g (emphases added).

Navient suggests we begin and end our inquiry with this language.  It argues that Counts II and IV of the Commonwealth's Complaint fall squarely within § 1098g's prohibition because they target the sufficiency of the disclosures Navient allegedly made to borrowers and expressly fault it for failing to make "disclosures" or provide "notice" that state law required Navient to provide.  *See* App. 152 (Count II) (alleging Navient violated the PA Protection Law because "[i]n phone calls[] [it] failed to meaningfully disclose . . . that the federal [G]overnment offers IDR plans"); App. 156 (Count IV) (alleging Navient violated the PA Protection Law because it "[f]ailed to disclose a date certain by which a borrower must submit materials to recertify an [IDR] plan," and "[f]ailed to adequately notify borrowers . . .  of the existence of the renewal notice").

The language of § 1098g is indeed broad and unqualified; it expressly preempts "any" state claim premised on "any" disclosure requirement imposed by state law regarding such loans.  However, as noted above, "the presence of an express preemption provision does not end the inquiry. While it means we need not inquire whether Congress intended to preempt some state law, we still must examine congressional intent as to the scope of the preemption provision."  *Farina*, 625 F.3d at 118.  To identify the domain expressly preempted by Congress, we read "the words of a statute . . . in their context

28

and with a view to their place in the overall statutory scheme." *Home Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (citation and internal quotation marks omitted).

Here, we are persuaded by the Eleventh and Seventh Circuits' recent statements on the scope of the Education Act's express preemption provision. In *Lawson-Ross*, borrowers brought suit under Florida's Consumer Collection Practices Act against their federal student loan provider for making affirmative misrepresentations about their eligibility for the Public Student Loan Forgiveness program (the "Loan Forgiveness Program"). 955 F.3d at 911. In determining what domain is expressly preempted by the Education Act, the Eleventh Circuit explained,

> Section 1098g concerns 'disclosure requirements,' but the [Education Act] does not define 'disclosure requirements' or 'disclosure.' The [Education Act] does, however, identify the disclosures it requires. Viewed in its statutory context, then, the term 'disclosure requirements' refers to the [Education Act]'s requirements that certain information be communicated to borrowers during the various stages of a loan, as laid out in § 1083 of the statute. Thus, the domain § 1098g preempts is the type of disclosures to borrowers that § 1083 requires.

*Id*. at 917 (citing 20 U.S.C. §§ 1083(a), (b), (e)). The Court concluded "that the precise language Congress used in § 1098g preempts only state law that imposes disclosure requirements; state law causes of action arising out of affirmative misrepresentations a servicer voluntarily made that did not concern the subject matter of required disclosures impose no disclosure requirements." *Id*. (internal quotation marks omitted).

The servicer in *Lawson-Ross*, like Navient here, argued that borrowers' affirmative misrepresentation claims were actually based on a failure to disclose correct information. The Court rejected this characterization of the claims. It saw "no allegation that [the servicer] failed to provide them with any information that it had a legal obligation to disclose. Rather, the [b]orrowers alleged that when [the servicer] chose to provide them with information it was not required to disclose . . . it gave false information." *Id*. at 918. The Court found "support for this distinction between an affirmative misrepresentation and a failure to disclose in the law of torts. To succeed on a failure-to-disclose claim, the plaintiff must establish that there was a duty to speak and the duty was breached." *Id*. at 918 (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)). "In contrast, a claim alleging an affirmative misrepresentation does not rely on a duty to disclose." *Id*. The borrowers' claims about the servicer's misrepresentations about their eligibility for the Loan Forgiveness Program were thus not preempted. *Id*. at 919-20.

Similarly, the Seventh Circuit in *Nelson* held that § 1098g does not expressly preempt state consumer protection laws to the extent they target affirmative misrepresentations rather than failures to disclose required information. 928 F.3d at 647–50. There a borrower's state-law consumer protection and tort claims alleged that her federal student loan servicer made affirmative misrepresentations while counseling her on her repayment plan options. The Court concluded her claims were not expressly preempted, explaining that

> [w]e recognize that it would be possible to apply state consumer protection laws to impose additional disclosure requirements on loan servicers of federally insured student loans. Such applications would be preempted under § 1098g . . . . But that result is not necessary or

30

inherent in [the borrower's] claims, at least to the extent she alleges affirmative misrepresentations. We cannot say on the pleadings that all of [the borrower's] claims are preempted by § 1098g. On remand, the district court may need to use jury instructions and other tools to allow [the borrower] to proceed on her claims of affirmative misrepresentations while ensuring that the case does not become a vehicle for state law to impose new disclosure requirements.

*Id.* at 650 (internal citation omitted). The Court explained that "[t]he common law tort of fraud ordinarily requires a deliberately false statement of material fact. . . . An omission or failure to disclose, on the other hand, will not support a common law fraud claim but may be actionable as constructive fraud or fraudulent concealment. . . ." *Id.* at 649 (internal citations omitted). Because the borrower alleged that the servicer "said something false that it was not required to say," the Court concluded that the claim did not imply a disclosure requirement. *Id*. at 649.

Both *Nelson* and *Lawson-Ross* built on a distinction first drawn by the Ninth Circuit in *Chae*, 593 F.3d 936, wherein plaintiffs brought claims under California's consumer protection statute and accused Sallie Mae of both "misrepresent[ation]" and "improper . . . disclosure" of information to borrowers about federal student loans. 593 F.3d at 942–43. The Court held that the plaintiffs' attempt to assert claims under California law regarding certain billing statements and coupon books was expressly preempted by § 1098g of the Education Act, but the plaintiffs were not barred from pursuing claims regarding other fraudulent and deceptive practices. *Id*. at 943. The Court made clear, however, that plaintiffs could not simply "relabel[]" their preempted

disclosure claims as misrepresentation claims. *Id*. at 943 (citation omitted).

We follow these well-reasoned decisions and adopt the distinction between affirmative misrepresentation and failure to disclosure information as required by the Education Act. Section 1098g does not expressly preempt claims to the extent they are alleging affirmative misrepresentations rather than failures of disclosure.

Turning to our case, we are not convinced that all, or even most, of the Commonwealth's claims are based on failures of disclosure. The Commonwealth's core allegations with respect to Counts II and IV are that Navient improperly steered consumers into costly forbearances and made misrepresentations to consumers regarding the recertification of their IDR plans. This included misrepresenting to consumers that Navient would inform them of the date by which they needed to renew and misrepresenting the consequences of failing to renew. To the extent the Commonwealth faults Navient for failing to disclose or notify borrowers of certain information, it does so only because Navient's failure to disclose certain information furthered the affirmative misrepresentations Navient voluntarily chose to make. For example, the Commonwealth alleges:

- Navient's website misrepresented to borrowers that its representatives would help them "make the right decision for [their] situation" and "find an option that . . . minimizes [their] total interest cost." App. 130.

- Navient misrepresented to a consumer "that her only option for loan assistance was a forbearance, despite the fact that she qualified for an IDR plan." App. 135.

- Navient gave false information about public service loan forgiveness to one borrower, causing the borrower to lose out on seven years of payments that could have been applied to this forgiveness program but were not. App. 136.

- Navient repeatedly enrolled a consumer in forbearance various times over eleven years, allowing nearly $27,000 in interest to accrue, despite his later eligibility for an IDR plan.  App. 136–37.

- Navient told a consumer enrolled in IDR who was having trouble making payments that "forbearance was his only option" when, in fact, "continuing his IDR plan would have been a better option for him in the long term."  App. 137.

- In a notice to borrowers, Navient misrepresented that it would notify the borrowers when their IDR plan was up for renewal and, at that time, it would provide the borrower with a date to submit a new application.  Yet the notices it sent did not include this date.  App. 138–39.

- In a notice to borrowers, Navient misrepresented that the only consequence of providing incorrect or incomplete information during the IDR renewal process would be a delay in renewal when, in fact, providing incorrect or incomplete information resulted in financial harm to borrowers.  App. 140.

- Navient told a consumer that it would send him an annual renewal reminder when, in fact, it did not.  App. 142.

To the extent these allegations hold Navient accountable for its affirmative misconduct, they are not preempted. The Commonwealth cannot fault Navient for failing to provide consumers with more information about IDR plans or recertification, but it can fault Navient for providing misinformation.

Navient attempts to distinguish our case from *Nelson* by arguing that, unlike the voluntary and excessive statements there, some of the alleged misstatements it posted were required by federal law to appear on its website. Specifically, the Commonwealth alleges that Navient made the following statements on its website regarding its ability to help borrowers:

- "If you're experiencing problems making your loans [sic] payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation."

- "We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."

App. 130. The *Nelson* Court held nearly identical statements were indeed affirmative misrepresentations not preempted by § 1098g because the servicer made those statements voluntarily when it could have just remained silent or told the truth. *See Nelson*, 928 F.3d at 649–50; *see id.* at 641–42 ("[o]ur trained experts work on your behalf" and "[y]ou don't have to pay for student loan services or advice," as "[o]ur expert representatives . . . understand all of your options").

Navient does not actually cite to any provision of law that would have required it to misrepresent to borrowers that it will help them "make the right decision for [their] situation" or

help them "minimize[] [their] total interest cost." The provisions it cites are off point. Section 1083 of the Education Act merely requires that lenders include on a "bill or statement . . . the lender's or loan servicer's address and toll-free phone number for payment and billing error purposes" and "a link to the appropriate page of [the DOE's] website to obtain a more detailed description of the repayment plans . . . ." 20 U.S.C. § 1083(e)(1)(H) & (I). It does not say what statements Navient must make on its website. Navient went beyond providing addresses, telephone numbers, and links while affirmatively representing that it would help borrowers make the "right" decisions and "minimize" their interest payments.

All this to say that the District Court correctly concluded that the Commonwealth's complaint alleges Navient made numerous affirmative misrepresentations, and claims based thereon are not expressly preempted by the Education Act. It is possible that on remand (especially if Navient again moves for dismissal) the District Court may need to conduct a closer, allegation-by-allegation, assessment of which claims in the Commonwealth's complaint are based on affirmative misrepresentations and which are possibly based on failures of disclosure. It would need to do so in the first instance in accord with this opinion and Pennsylvania law. *Lawson-Ross*, 955 F.3d at 911, and *Nelson*, 928 F.3d at 648, also provide guidance.[12]

---

[12] The District Court may also need to consider whether the Commonwealth alleges any material omissions, and if so, whether those claims would be preempted by § 1098g. While *Lawson-Ross*, 955 F.3d at 911, and *Nelson*, 928 F.3d at 648, provide insight into the distinction between an affirmative misrepresentation on one end, and a failure to disclose on the other, they do not discuss where the line is between the latter

and a material omission. If, for example, a Navient representative told a borrower that her "best option" for resolving loan repayment issues was forbearance but failed to mention a more appropriate IDR plan, is the failure to mention the IDR plan a material omission or an affirmative misrepresentation? If the former, is it also expressly preempted by the Education Act? We decline to rule on this issue without briefing by the parties and without first giving the District Court an opportunity to assess this issue in light of Pennsylvania law. We also decline to say in the first instance whether the Commonwealth alleges any material omissions.

We note that, under Pennsylvania law, to state a claim for intentional misrepresentation a plaintiff must allege "(1) [a] representation; (2) which is material . . .; (3) made falsely, with knowledge of its falsity . . . ; (4) with the intent of misleading another . . . ; (5) justifiable reliance on the misrepresentation; and[] (6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (citing, *inter alia*, Restatement (Second) of Torts § 525 (1977)). The tort of "intentional non-disclosure has the same elements as intentional misrepresentation except[,] in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation." *Id.* (citation and internal quotation marks omitted). Concealment of a material fact can amount to actionable fraud if the seller intentionally concealed a material fact to deceive the purchaser. *See Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991); *Sevin v. Kelshaw*, 611 A.2d 1232, 1237–1238 (Pa. Super. Ct. 1992) ("[A]ctive concealment of defects *known to be material* to the purchaser is legally equivalent to an affirmative misrepresentation.") (emphasis in original); *see*

### 3. Section 1098g Does Not Impliedly Conflict Preempt the Commonwealth's State-Law Claims.

We next turn to Navient's argument that even if § 1098g does not expressly preempt Counts II and IV, ordinary conflict-preemption principles bar them. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–70 (2000) (holding that the presence of an express preemption clause does not preclude "the ordinary working of conflict pre-emption principles"). To repeat, state laws are preempted if it is impossible for a party to comply with both state and federal law or they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (citation omitted).

The Supreme Court explained in *Cipollone* that "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, . . . there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." 505 U.S. at 517 (internal citation and quotation marks omitted). The Court relied on the statutory canon "of *expressio[] unius est exclusio alterius* [to include

---

*also Derby & Co., Inc. v. Seaview Petroleum Co.*, 756 F. Supp. 868, 876 (E.D. Pa. 1991) (stating that "[t]he failure to disclose a material fact amounts to a misrepresentation where disclosure would correct a mistake as to a basic assumption and non-disclosure amounts to a failure to act in good faith . . . ."). *But see Martin v. Hale Prods., Inc.*, 699 A.2d 1283, 1288 (Pa. Super. Ct. 1997) (stating that "[m]ere silence in the absence of a duty to speak" does not constitute fraud). Thus, it appears that under Pennsylvania law intentional material omissions are treated similarly to affirmative misrepresentations.

one is to exclude all others]: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id.*

We agree with the Eleventh and the Seventh Circuits that, per the Supreme Court's instruction in *Cipollone*, we need not infer congressional intent to pre-empt state laws by the Education Act. Both reasoned that "[w]hen Congress has explicitly addressed preemption in a statute, an implication arises that it did not intend to preempt other areas of state law." *Lawson-Ross*, 955 F.3d at 920 (citations omitted); *Nelson*, 928 F.3d at 648 (same). The Education Act includes several provisions expressly preempting specific areas of state law, including § 1098. *See also* 20 U.S.C. §§ 1078(d) (state usury laws); 1091a(a)(2) (state statutes of limitations); 1091a(b)(2) (state law infancy defense).

We note that the Ninth Circuit in *Chae* concluded otherwise and held that although some of the borrowers' claims were not expressly preempted by § 1098g, they nonetheless were implicitly preempted because they posed an obstacle to the uniform operation of the Education Act. 593 F.3d at 946-47. The Court concluded that uniformity was an intended purpose of the Education Act as illustrated by Congress's direction to the DOE to standardize the Indirect Loan Program's forms, procedures, terms, conditions, and benefits throughout federal student loan programs. *Id.* at 944–45. It reasoned that allowing state law causes of action to proceed would conflict with the purpose of uniformity. *Id.* at 943, 945.

We are not persuaded by the Ninth Circuit's conclusion that uniformity was an intended purpose of the Education Act, and we join the other Circuits that have rejected that idea. *Lawson-Ross*, 955 F.3d at 922; *Nelson*, 928 F.3d at 651; *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 597 (4th Cir. 2005) ("We are unable to confirm that the creation of

uniformity . . . was actually an important goal of the [Education Act].") (internal quotation marks omitted). "To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive." *Hillsborough*, 471 U.S. at 717. Thus we do not apply preemption from the comprehensive nature of a regulation alone. *See N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973).

The Seventh Circuit aptly pointed out that *Chae*'s broad language was based on a different sort of claim, relating to the method of setting late fees, repayment start dates, and interest calculations. The *Nelson* Court assumed that "the need for nationwide consistency on those sorts of *administrative mechanics* is substantial" and that there "the value of uniformity would be more compelling." 928 F.3d at 651 (emphasis added). Allegations of affirmative misrepresentations and misconduct stand in stark contrast. There is no indication that Congress had the sweeping goal of regulating all misconduct that could possibly occur in student-loan financing and requiring uniformity of all claims tangentially related to the Education Act. "[S]tate law and federal law can exist in harmony" under the Education Act, *Nelson*, 928 F.3d at 651, and conflict preemption does not bar the Commonwealth's claims.

### 4. Section 1098g Does Not Field Preempt the Commonwealth's Claims under the PA Protection Law.

Navient does not expressly argue that § 1098g preempts the field of regulation of student loans, but, to the extent it suggests as much, *see* Navient Br. 31, 35 (describing the language of § 1098g as "unqualified" and creating a "comprehensive federal regulatory scheme"), we reject that

39

suggestion as well. Field preemption exists "where Congress has legislated so comprehensively [in an area of law] that it has left no room for supplementary state legislation." *R.J. Reynolds Tobacco Co. v. Durham Cty.*, 479 U.S. 130, 140 (1986). Every Circuit Court to consider the issue has concluded that the Education Act does not field preempt the regulation of student loans. *See, e.g.*, *Lawson-Ross*, 955 F.3d at 923; *Nelson*, 928 F.3d at 651-52; *Chae*, 593 F.3d at 941–42; *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir. 1999); *Keams v. Tempe Tech. Inst., Inc*., 39 F.3d 222, 226 (9th Cir. 1994). And indeed, consumer protection is a field that states have traditionally occupied. *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (noting the long history of state common-law and statutory remedies against unfair business practices); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963) (observing that statute to "prevent the deception of consumers" was within scope of state's police powers); *In re Nortel Networks, Inc*., 669 F.3d 128, 137–38 (3d Cir. 2011) (noting that consumer protection is part of governmental police powers).

From a practical standpoint, if we were to hold that the Education Act preempts state-law consumer protection claims, consumers would be left with no protection against unfair or deceptive acts or practices by loan servicers because the Education Act contains no general prohibition against those practices. Taken to its logical conclusion, Navient's proposed outcome here would mean that servicers would in theory be free to mislead consumers provided that they met the Education Act's technical disclosure requirements. That outcome is untenable. "It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Silkwood v. Kerr-McGee Corp*., 464 U.S. 238, 251 (1984). Field

preemption thus does not apply to the Commonwealth's claims.[13]

\* \* \* \* \*

The Commonwealth's parallel enforcement action against Navient under the Consumer Protection Act is permitted by the statute's plain language, and the Education Act does not expressly preempt the Commonwealth's claims under the PA Protection Law to the extent they are based on affirmative misrepresentations and misconduct rather than

---

[13] The States argue in their Amicus brief that they are well positioned to protect their residents from unfair and deceptive practices by student loan servicers. Many States have developed comprehensive systems for tracking and responding to complaints from consumers. In the last five years, amici have collectively received and responded to thousands of complaints about federal student loan servicers—including many against Navient. And the federal Government has for decades welcomed the States' expertise and worked with the States to provide active oversight in the student loan industry. For example, the DOE's regulations and servicer contracts expressly require compliance with not only federal laws but also state laws. *See, e.g.*, 34 C.F.R. § 682.401. Starting in 2000, at the latest, the DOE routinely disclosed student loan information to state and local authorities that were investigating and prosecuting crimes, civil frauds, and other violations in the student loan industry. *See* Privacy Act of 1974, 64 Fed. Reg. 72384, 72399 (Dec. 27, 1999); Privacy Act of 1974, 81 Fed. Reg. 12081-02, 12083 (Mar. 8, 2016). Likewise, the Bureau shares with states information it receives in consumer complaints. Amicus Curiae Br. for States of New York et al. 16–17.

41

failures of disclosure.  No other preemption principle stands as a bar to the Commonwealth's claims.  We thus affirm the District Court's well-reasoned ruling.